

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-2-1994

# Kline, et al. v. First Western Government Securities, Inc., et al.

Precedential or Non-Precedential:

Docket 92-1498

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Kline, et al. v. First Western Government Securities, Inc., et al." (1994). *1994 Decisions.* Paper 3.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/3

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 92–1498; 92–1499


ERNEST P. KLINE;
EUGENE KNOPF; STEVEN R. WOJDAK

v.

FIRST WESTERN GOVERNMENT SECURITIES, INC.;
SIDNEY P. SAMUELS; SAMUELS, KRAMER AND CO.;
ARVEY, HODES, COSTELLO AND BURMAN

Ernest P. Kline & Eugene F. Knops, Appellants, in 92–1498

Arvey, Hodes, Costello & Burman, Appellant in 92–1499


On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civil Action No. 83–01076)


Argued:  January 25, 1993

Before:  GREENBERG, ROTH and LEWIS, Circuit Judges

(Opinion Filed  May 2, l994  )


Ronald  F. Kidd, Esquire (Argued)
Joseph D. Mancano, Esquire
Teresa N. Cavenagh, Esquire
Duane, Morris & Heckscher
4200 One Liberty Place
Philadelphia, PA 19103–7396
        Attorneys for Appellants

First Western Government Securities, Inc.
c/o Mr. Sidney P. Samuels
3683 Sacramental Street
P.O. Box 18211
San Francisco. CA 94118
        Attorney for Appellees:
                First Western Government Securities, Inc.
                Sidney P. Samuels
                Samuels Kramer & Co.

John E. McKeever, Esquire (Argued)
Lori S. Cozen, Esquire
Schnader, Harrison, Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103
        Attorneys for Appellee Arvey, Hodes, Costello & Burman


OPINION OF THE COURT


ROTH, Circuit Judge:


        This appeal arises from a suit alleging, among other things, violations of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), in connection with plaintiffs' investment in forward contracts through defendant First Western Government Securities ("First Western"). Defendant Arvey, Hodes, Costello & Burman ("Arvey"), a Chicago law firm, issued three opinion letters concerning the tax consequences of these investments. Plaintiffs Ernest P. Kline and Eugene F. Knopf allege that Arvey's opinion letters contained both affirmative misrepresentations and material omissions in their treatment of these transactions. They further contend that they relied upon

2

these opinion letters in deciding to invest with First Western and that as a result they incurred substantial financial losses. The district court denied Arvey's motion for summary judgment on the misrepresentation claim but granted it on the omissions claim. We conclude that both the misrepresentation and omissions claims should be tried. We will therefore affirm in part and reverse in part, and we will remand the case to the district court for further proceedings consistent with this opinion.

I.

It is important to emphasize at the outset that, because we are reviewing the partial grant of a motion for summary judgment, we must view the facts in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Thus, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The central figure in this case is defendant Sidney Samuels, who founded First Western in 1978. Prior to that time Samuels was a general partner in Price & Company ("Price"). According to plaintiffs, First Western's trading program was substantially similar to Price's and indeed was modeled on it. Significantly, Arvey represented both Price and First Western. Arvey assisted Samuels and his partner, Larry Price, in the formation of Price, drafted Price's limited partnership agreement and its 1977 offering memorandum, and represented it in connection with IRS civil and criminal investigations. Arvey

3

began assisting Samuels in setting up First Western while he was still a general partner in Price. The firm became First Western's general counsel and assisted in the drafting of forms to be used by First Western, including the brochure describing the program. There is some suggestion in the record that Arvey helped design the straddle transactions used by First Western. (Joint Appendix ("JA") at 154.) At First Western's request, Arvey also provided it with three opinion letters addressing the federal income tax treatment of these transactions. These opinion letters were dated September 20, 1978, June 8, 1979, and November 12, 1980.

The transactions engaged in by First Western involved forward contracts to purchase and sell money market instruments, specifically Government National Mortgage Association securities ("GNMA's") and Federal Home Loan Mortgage Corporation participation certificates ("FMAC's"). A "forward contract" is a contract to purchase or sell a specified security, at a designated interest rate, on a fixed future date. In a straddle transaction an investor enters into a pair of forward contracts, agreeing both to buy and sell securities in the future. The difference between the "buy" contract and the "sell" contract results in a "spread" position, resulting in gain or loss to the investor depending on whether interest rates rise or fall. Accordingly, before entering into a straddle an investor must decide how to "bias" the spread by predicting whether interest rates will rise or fall.

4

First Western's agreements with its customers provided that a customer could arrange for the cancellation of his obligations under a forward contract prior to the settlement date. First Western would then "charge or credit the customer's account with an amount equal to the profit First Western or the customer, respectively, would be entitled to receive in the event delivery was effectuated pursuant to such contract as of the date of cancellation." (Arvey Opinion Letters, 9/20/78, JA at 138; 6/8/79, JA at 562.) Typically investors would choose to cancel the losing side of their straddle. The tax treatment of the resulting loss was the subject of the Arvey opinion letters.

In the opinion letters Arvey concluded that, if First Western and a customer agreed "to cancel a forward contract prior to its settlement date, the consequent gain or loss realized by the customer should constitute ordinary gain or loss to be recognized by the customer in the year in which the contract is canceled." (Arvey Opinion Letter, 6/8/79, JA at 563.)[0] The three letters also contained language advising First Western that the Internal Revenue Service and the courts might arrive at a contrary conclusion.

As the following excerpts show, each of the letters also provided that the opinions were based on facts as provided by First Western and were for the use of First Western only:

September 20, 1978, letter:

---

[0]The September 20, 1978, and the November 12, 1980, letters contain essentially the same language. (JA at 139-40, 578.)

5

The following paragraphs contain a summary of such transactions as you [First Western] have described them to us. (JA at 135.)

[T]his opinion is subject to the consummation of the transactions between First Western and its customers under the facts and conditions described above and is further expressly conditioned on your representation that the transactions entered into by First Western and its customers will be for the purpose, and with a reasonable expectation, of economic gain. (JA at 140.)

This letter is intended for your personal use only and is not intended to be, and should not be, relied upon by persons other than First Western. (JA at 149.)

June 8, 1979, letter:

You have advised us that the facts set forth below constitute an accurate and complete presentation of all relevant information with regard to such transactions. (JA at 558.)

[T]his opinion is subject to the consummation of the transactions between First Western and its customers pursuant to the facts and conditions described above and is further expressly conditioned on your representation that such transactions will be consummated by the customers of First Western with a reasonable expectation of economic gain. (JA at 563.)

This letter is intended for your personal use only and is not intended to be, and should not be, relied upon by persons other than First Western. (JA at 574.)

November 12, 1980, letter:

You have advised us that the facts set forth below constitute an accurate and complete presentation of all relevant information with regard to the transactions between First Western and its customers, and that no material fact necessary to make the

6

information herein not false or misleading has been omitted. (JA at 576.)

[T]he conclusions set forth herein are based upon the facts and conditions described in this letter as you have represented them to us and we express no opinion as to the tax treatment of any transaction to the extent the facts may differ from those contained herein.

We express no opinion concerning any federal income tax consequence other than as specifically set forth in this letter, and no opinion is expressed with respect to state and local taxes, federal or state securities laws, or any other federal or state law not explicitly referenced herein. We also express no opinion as to the advisability of undertaking any transaction described in this letter, in that any such determination must take into account the individual facts and circumstances affecting the particular taxpayer.

This letter is intended solely for the internal use of First Western and, accordingly, it is not intended to be, and should not be, relied upon by any person other than First Western. Further, this letter is not to be quoted or otherwise referred to in any documents, including financial statements of First Western, nor is it to be filed with or furnished to any government agency or other person without the express prior written consent of this firm. Such consent has not been given, and will not be given, unless the person to whom this letter is to be furnished has previously agreed, in writing, that he will not rely upon the opinions and conclusions expressed herein, but will make his own independent evaluation of the federal income tax consequences of any transactions to be entered into with First Western. (JA at 591.)

A couple of themes emerge from these excerpts. First, Arvey stressed that its view of the transactions' validity hinged on whether they were entered into with a reasonable expectation

of generating a profit.  Second, the letters asserted that Arvey's conclusions might be changed by facts and circumstances unique to individual customers' accounts.  Arvey also made these points in response to inquiries from potential First Western customers about its opinion letters.  (JA at 365-77.)

Despite the letters' statement that they were for the exclusive use of First Western, Arvey was aware at least as early as May 31, 1979, that its opinion letters had reached potential investors.  (JA at 365.)  The record before us reflects some ten instances in which potential First Western investors contacted Arvey regarding its opinion.  (JA at 365-78.)  As the following excerpt from an October 21, 1980, letter to Arvey from an attorney representing a potential investor makes clear, Arvey was put on notice that its efforts to dissuade reliance were not always successful:

> Surely you realize that First Western Government Securities is using your letter in an effort to obtain investors and is furnishing copies of your letter with brochures indicating the mechanical operation of the program.  As a result, notwithstanding statements made in your October 16, 1980, letter, please be advised that my client is awaiting my receipt of your opinion letter before making a decision as to his investment with First Western Government Securities. (JA at 376.)

Plaintiffs Kline and Knopf invested in forward contracts with First Western in December 1980, after reading and relying upon Arvey's June 1979 and November 1980 opinion letters. They incurred losses on their investments, deducted these losses

in their income tax filings, and had their deductions disallowed by the IRS.

Kline and Knopf allege that Arvey knew or recklessly disregarded the truth about First Western's trading program. As a result, they contend, Arvey in its opinion letters made material misrepresentations and omitted material facts concerning the actual structure of First Western transactions. Plaintiffs allege a number of misrepresentations. They allege that the opinion letters stated that under the First Western trading program investors would be required to make or accept delivery of the underlying securities when in fact no such requirement existed. They allege that the opinion letters represented that the prices of First Western's contracts moved independently, and thus subject to market risk, when in fact First Western's computer trading program artificially set the prices to eliminate any risk of loss.[0] They allege misrepresentations as to whether

---

[0] Plaintiffs contend that the prices set by First Western's computer program bore virtually no relation to actual market prices. They point to a study of the First Western trading program undertaken by Professor E. Philip Jones of Harvard Business School. Following a thorough analysis of First Western's operations, including a review of the assumptions used in the computer pricing program, Professor Jones concluded as follows:

> First Western's portfolios were a sham. There was no independent movement of prices of different contracts. Most of the risk on one side of a portfolio was exactly cancelled by the risk on the other side of the portfolios. ... This cancellation of risk was accomplished by ignoring market prices for GNMAs and FHLMCs, in favor of artificial pricing calculations that resulted in prices which were substantially different from market prices.

customers would be required to make additional margin deposits and as to how First Western calculated the fees it charged for cancellation of contracts. Finally, they allege that the opinion letters misrepresented the fact that First Western's transactions were designed to obtain tax losses and as structured could not support a reasonable expectation of economic gain.

As for material omissions, plaintiffs allege that Arvey made no reference to prior IRS investigations of Price & Company or Sidney Samuels' connection to that firm.[0] Furthermore, a number of investigations into First Western's trading program had commenced by the time Arvey issued its final opinion letter. The IRS had audited a number of First Western investors, the SEC had started an investigation and requested numerous documents from First Western, and the Minnesota Department of Commerce was investigating First Western. The only reference to these activities in the November 12, 1980, opinion letter was as follows: "Further, you have informed us that customers of First Western are being audited by the Service and that the Service has questioned the deductibility of losses realized by customers on the basis of the theory set forth by the Service in Rev. Rul. 77-185." (JA at 588.) The letter made no mention of the SEC or

---

(JA at 527.)
[0]As noted above, plaintiffs allege that First Western's trading program was modeled after Price's. Thus, plaintiffs allege that Arvey should have disclosed the fact that, before Arvey issued its 1979 opinion letter, the IRS had undertaken a criminal investigation into Price's operations. The IRS investigations ultimately led to a finding that Price's trades were sham transactions. Price v. Commissioner, 88 T.C. 860 (1987).

10

State of Minnesota investigations, or the IRS investigation into Price.

Arvey moved for summary judgment on the omissions claim, the misrepresentation claim, and tort and RICO claims not before us on this appeal. The district court denied summary judgment on all counts except those asserting liability for omissions of material fact. Because the district court believed that this case presents two "'controlling issues of law as to which there is a substantial ground for difference of opinion,'" Kline v. First Western Gov't Secs., 794 F.Supp. 542, 557 (E.D.Pa. 1992) (quoting 28 U.S.C. § 1292(b)), it certified for immediate appeal the following two issues: first, whether an attorney may be held liable for alleged misrepresentations of fact in an opinion letter when those alleged factual statements have been specifically attributed to another individual; and, second, whether attorneys may be held liable for omissions of fact in an opinion letter absent a duty to disclose.[0] The district court also ruled that Arvey did not meet its burden of proving that

---

[0] Plaintiffs sued defendant Arvey under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j) and Rule 10(b)(5), 17 C.F.R. 240.10b-5, both as an aider and abettor in Count I of the complaint and a primary violator in Counts IV and VI. We note that in Central Bank v. First Interstate Bank, the Supreme Court ruled that "a private plaintiff may not maintain an aiding and abetting suit under §10(b)." 62 U.S.L.W. 4237 (U.S. April 19, 1994). This ruling would appear to bar plaintiffs' claims against Arvey in Count I, a point which we do not now decide. However, we do not believe it affects our analysis with respect to whether Arvey may be held liable for material misrepresentations or omissions as a primary violator under Counts IV and VI.

plaintiffs' reliance was unreasonable, id. at 552-54, but did not certify that issue for appeal.

## II.

The district court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.  This court has jurisdiction over this certified interlocutory appeal pursuant to 28 U.S.C § 1292(b).  This court granted both parties' petitions to appeal on June 8, 1992.

Our review of a district court's grant of summary judgment is plenary.  Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir. 1988).  "On review the appellate court is required to apply the same test the district court should have utilized initially."  Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977).

A court may grant summary judgment only when the submissions in the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "The inquiry performed is the threshold inquiry of determining whether there is the need of a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, 477 U.S. at 250.  Stated differently, "a motion for summary judgment must be granted unless the party opposing the motion can produce evidence which, when considered in light of that party's burden of proof

12

at trial, could be the basis for a jury finding in that party's favor."  J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 618 (3d Cir. 1987)(Becker, J., concurring).  Thus, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

III.

The district court in its resolution of Arvey's motion for summary judgment relied on the distinction between liability imposed under Rule 10b-5 for misrepresentations and that imposed for omissions.  While this distinction is significant in some circumstances,[0] we do not find it helpful to resolving the particular issues presented in this case.  We conclude instead that attorneys may be liable for both misrepresentations and omissions where the result of either is to render an opinion letter materially inaccurate or incomplete.

A.  The Misrepresentations Claim

Arvey argues that the district court erred in denying summary judgment in its favor on plaintiffs' claims that Arvey is liable under the federal securities laws for affirmatively misrepresenting material facts concerning First Western's trading program.  Arvey contends that it was entitled to summary judgment on this claim for the simple reason that its opinion letters did

---

[0] For example, the Supreme Court has held that in cases "involving primarily a failure to disclose," i.e., omissions, reliance may be presumed.  Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153 (1972).

13

not contain any misrepresentations.  That is, it asserts that as a matter of law it cannot be held liable for an opinion letter in which it made explicit that it was basing its opinion on an assumed set of facts represented to it by its client and that it had conducted no independent investigation into whether those represented facts accurately reflected reality.  We are unpersuaded by this argument.

This court has generally recognized securities fraud claims based on allegations of misrepresentations in opinion letters.  We have held that "[a]n opinion or projection, like any other representation, will be deemed untrue for purposes of the federal securities laws if it is issued without reasonable genuine belief or if it has no basis."  Herskowitz v. Nutri/System, Inc., 857 F.2d 179, 184 (3d Cir. 1988), cert. denied sub nom. Nutri/System, Inc. v. Herskowitz, 489 U.S. 1054 (1989).  Interpreting the Supreme Court's "scienter" or intent requirement as articulated in Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976), we have explained that

> an opinion must not be made 'with reckless disregard for its truth or falsity,' or with a lack of 'genuine belief that the information disclosed was accurate and complete in all material respects.' Therefore, an opinion that has been issued without a genuine belief or reasonable basis is an 'untrue' statement which, if made knowingly or recklessly, is culpable conduct actionable under § 10(b) and Rule 10b-5.

Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir. 1985) (citations omitted), cert. denied sub nom. Wasserstrom v. Eisenberg, 474 U.S. 946 (1986).

14

Eisenberg concerned litigation over a tax shelter involving the sale of coal rights. The defendant law firm had prepared a tax opinion letter, which was included in the offering memoranda, in which it opined that the IRS would allow certain deductions. Plaintiffs alleged that the law firm knew that there was no reasonable basis for its opinion. We held that the law firm and an accounting firm that issued an opinion letter verifying profit projections included in the offering memoranda "are liable if they recklessly expressed opinions which they had good reason to believe were baseless." Id. at 778. We explained that such liability is proper because of the greater information possessed by professionals who express opinions upon which third parties would rely.

> When a representation is made by professionals or 'those with greater access to information or having a special relationship to investors making use of the information,' there is an obligation to disclose data indicating that the opinion or forecast may be doubtful. When the opinion or forecast is based on underlying materials which on their face or under the circumstances suggest that they cannot be relied on without further inquiry, then the failure to investigate further may 'support an inference that when the defendant expressed the opinion it had no genuine belief that it had the information on which it could predicate that opinion.'

Id. at 776 (citations omitted).

Herskowitz presented this court with a similar situation. In that case, we held that a securities fraud claim against a bank that had issued an opinion letter concerning the fairness of the transaction should be submitted to a jury when

the claim alleged that the bank knew that the assumptions on which it based its opinion were unfounded. Herskowitz, 857 F.2d at 184-85. See also Sharp v. Coopers & Lybrand, 649 F.2d 175, 184 (3d Cir. 1981), cert. denied, 455 U.S. 938 (1982) (recognizing securities fraud claim against accounting firm based on materially false representations contained in opinion letter).

These cases leave no doubt concerning the existence of a cause of action for knowing or reckless misrepresentations in opinion letters. The question we must address, then, is whether Arvey's disclaimers, to the effect that the opinion was based only on facts provided to it by Samuels, should lead us to conclude otherwise than that this case should go to trial. The district court relied on Gilmore v. Berg, 761 F.Supp. 358 (D.N.J. 1991), in concluding that the disclaimers should not have that effect. We agree with that analysis.

Gilmore involved a claim against an attorney who, in a tax opinion letter, represented that the purchase price of the real property involved in the tax shelter at issue was fair "as determined by the general partner." Id. at 370. Plaintiffs contended that the attorney knew that the property had been purchased out of bankruptcy for less than one-half the stated price. The court stated:

> The court agrees with plaintiffs that a jury could find [the attorney's] statement that "the purchase price of $5.3 million reflects the fair market value of the property as determined by the general partner" is so grossly misleading as to constitute actionable fraud in failing to disclose important facts underlying the determination of fair market value. [The attorney] seeks

> to exculpate his misleading statement by
> pointing to the qualifying language, "as
> determined by the general partner.' However,
> plaintiffs have presented evidence that ...
> [he] knew that the fair market value of $5.3
> million was insupportable.

Id.

The analysis in Gilmore, we believe, follows directly from Eisenberg and this court's other cases concerning liability for opinion letters. We held in Eisenberg that professionals and others with similar access to information must disclose data that calls into question the accuracy of an opinion. 766 F.2d at 776. This responsibility cannot be evaded by the inclusion of a statement that the opinion is based on facts provided by someone else. Thus, when a law firm knows or has good reason to know that the factual description of a transaction provided by another is materially different from the actual transaction, it cannot escape liability simply by including in an opinion letter a statement that its opinion is based on provided facts.

Plaintiffs here have alleged that Arvey had a long and close relationship with Samuels, which extended to assisting him in setting up First Western, designing the transactions in which First Western engaged, and acting as First Western's general counsel. Plaintiffs also point to Arvey's representation of Price, the firm on which First Western allegedly was modeled, in IRS audit proceedings. These allegations clearly permit the inference that Arvey knew or had good reason to know that the factual assertions contained in its opinion letters did not reflect the substance of actual First Western transactions. As

17

such, Arvey's opinions, despite their disclaimers, fall squarely within the category of opinion letters that we have held to be actionable.

That said, we feel it necessary to emphasize that there is a distinction between the issue we have just addressed--whether the presence of disclaimers precludes an action for misrepresentations--and the question of whether plaintiffs reasonably relied on the opinion letters. As this court has noted, a plaintiff bringing suit under § 10(b) and Rule 10b-5 must prove that the defendant (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury. In re Phillips Petroleum Secs. Litig., 881 F.2d 1236, 1244 (3d Cir. 1989).

Thus far we have been concerned with the first of these issues--whether Arvey is entitled to summary judgment based on its contention that its opinion letters did not contain misrepresentations because of the presence of the disclaimers. Whether plaintiffs' reliance on Arvey's opinion letters was reasonable pursuant to the standard we articulated in Straub v. Vaisman & Co., 540 F.2d 591, 598 (3d Cir. 1976), presents a separate issue. The presence and character of disclaimers has clear relevance to that determination.

The district court concluded that Arvey has not met its burden of showing that plaintiffs' reliance on the opinion letters was unreasonable, Kline v. First Western Gov't Secs., 794

18

F.Supp. at 552-54, and we believe that the record supports its conclusion. Although, as we have noted, the district court did not certify the reliance issue for our review, we nevertheless feel it necessary to address the issue briefly because under §1292(b) "it is the order that is appealable, and not the controlling question; and thus we may address any issue necessary to decide the appeal before us." Ivy Club v. Edwards, 943 F.2d 270, 275 (3d Cir. 1991), cert. denied sub nom. Del Tufo v. Ivy Club, 112 S.Ct. 1282 (1992). See also United States v. Stanley, 483 U.S. 669, 677 (1987). Thus we could reverse the denial of summary judgment if, like the dissent, we felt that plaintiffs' reliance was unreasonable as a matter of law.

In Straub we stated that a variety of factors should be considered in determining whether a plaintiffs' reliance was reasonable, including: (1) the existence of a fiduciary relationship; (2) plaintiffs' opportunity to detect the fraud; (3) the sophistication of the plaintiffs; (4) the existence of long-standing business or personal relationships; and, (5) access to the relevant information. 540 F.2d at 598. Consideration of the evidence before us in light of these factors, we believe, leads inexorably to the conclusion that there exists a genuine issue of material fact as to whether plaintiffs' reliance was reasonable so that the denial of summary judgment on this ground was proper.

We acknowledge that the first and fourth factors weigh in favor of Arvey. The rest, however, favor plaintiffs. There is no evidence suggesting that plaintiffs had access to

19

information that would have allowed them to understand that which they allege was really taking place.  Arvey, on the other hand, had an ongoing attorney-client relationship with First Western and Samuels.  Nor is there a suggestion that plaintiffs had an opportunity to detect the alleged fraud even without the benefit of access to such information.  And while Arvey argues that plaintiffs were sophisticated investors, the evidence does not compel the conclusion that they were so sophisticated in these matters that they should have recognized that the descriptions of the transactions in the opinion letters bore little relation to reality.[0]  A potential First Western investor, armed with Arvey opinion letters and the information about his own account that Arvey stressed might be important, could have obtained a tax opinion from his attorney that would have been wrong simply because of the misleading way in which the program allegedly was described in the opinion letters.[0]  Mere reliance on the legal

---

[0] Unlike the dissent, we do not believe that the fact that "the transactions discussed in the opinion letters were meant for sophisticated investors," typescript at 15, means that plaintiffs were in fact sophisticated enough to unravel First Western's scheme.  And while the "cutting edge" nature of these transactions perhaps should have put plaintiffs on notice of potential tax complications involving the transactions described in the opinion letters, id., it has no logical connection to whether plaintiffs should have suspected that Arvey knowingly misdescribed the transactions.

[0] The dissent contends that "there is no way that another attorney could have confirmed from the letters themselves that the facts underlying the opinions were correct as they were solely within the knowledge of First Western."  Typescript at 16-17.  Plaintiffs' claim, however, is that Arvey also knew or should have known that the descriptions of the transactions in the opinion letters were inaccurate.  We believe the record contains evidence sufficient to support the inference that Arvey had or should have had such knowledge, thereby creating a genuine issue

20

conclusions expressed in the opinion letters, without more, would have been unreasonable.  But we cannot say as a matter of law that it was unreasonable to rely on the description of First Western's trading program.  Indeed, such reliance would be consistent with the disclaimers insofar as an independent legal opinion was sought on the basis of the description of the program.

In addition to disputing our application of Straub to this case, the dissent feels that Arvey is entitled to summary judgment based on the "bespeaks caution" doctrine.  Under that doctrine

> when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the 'total mix' of information the document provided investors.  In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.

In re Donald J. Trump Secs. Litig., 7 F.3d 357, 371 (3d Cir. 1993).  See also Donald C. Langevoort, Disclosures that "Bespeak Caution", 49 Bus. Law. 481 (1994) (summarizing and analyzing "bespeaks caution" jurisprudence).  Not just any cautionary language will trigger application of the doctrine.  Instead, disclaimers must relate directly to that on which investors claim to have relied.  As we noted in Trump, "a vague or blanket

---

of material fact.  Assuming Arvey possessed such knowledge, its recitations of the facts "as provided to it by First Western" were made without a genuine belief in their validity and thus actionable under the law as expounded in the body of our opinion.

(boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.  To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge."  7 F.3d at 371-72.

So conceived, the "bespeaks caution" doctrine clearly does not apply to this case except to the extent that plaintiffs relied solely and without further investigation or consideration on the opinion letters' conclusions as to the tax consequences of the First Western transactions.  The cautionary statements in the opinion letters provided investors with information that should have suggested nothing more to them than the possibility that Arvey might have gotten the law wrong or incorrectly assessed the risk that the IRS would deny deductions.  The opinion letters did not contain statements from which plaintiffs should have inferred the risk that Arvey was knowingly or recklessly misstating the structure of the entire First Western trading program.

In the only other case that we have found concerning a similar situation the court reached the same conclusion.  The court in Griffin v. McNiff, 744 F.Supp. 1237 (S.D.N.Y. 1990), aff'd without op., 996 F.2d 303 (2d Cir. 1993), provided the following account of the case and its resolution:

> Plaintiffs ... challenge more than just the future forecasts and predictions in the offering materials.  They argue that the underlying assumptions of the PPMs, tax opinions and projections were designed to mislead the investors into believing that the partnership investments offered them the

> opportunity to achieve a profit and a tax benefit from their investment, when in reality defendants knew that these possibilities did not exist ... . Inasmuch as certain of these allegations go to the misleading nature of the statements when made, the existence of cautionary language regarding the general unpredictability of, inter alia, oil and gas operations, economic trends, and the interpretation of the tax laws, will not bar plaintiffs from maintaining their claims against the remaining defendants.

Id. at 1253-54 (footnote omitted).

In order for there to be a plausible argument for application of the "bespeaks caution" doctrine in this case more than the simple assertion that the opinion is based on represented facts is required. Trump requires that the language bespeaking caution relate directly to that by which plaintiffs claim to have been misled. 7 F.3d at 371-72. Under the law regarding omissions, discussed in the next section, Arvey's statement that its opinion was based on facts represented to it by First Western also contained the implicit assertion that Arvey did not know the facts to be otherwise. It could not therefore have alerted plaintiffs to the possibility that Arvey did know otherwise. Thus, for the doctrine to even conceivably preclude plaintiffs' claims in this case it would be necessary for the letters to have included a disclaimer stating, in essence, that there was a possibility that Arvey did know otherwise and that the opinion letter was a sham commissioned to construct a facade of legitimacy for a trading program that both First Western and

Arvey knew was a farce.[0]  We find no such language and therefore conclude that Arvey was not entitled to summary judgment in its favor on the basis that plaintiffs' reliance was unreasonable as a matter of law.

### B.  The Omissions Claim

The district court granted summary judgment for Arvey on all claims to the extent that they alleged liability for omissions of material fact.  The court reasoned that attorneys cannot be held liable for omissions in an opinion letter unless plaintiffs can demonstrate that the attorneys had a duty to disclose to them the information that was omitted.  Id. at 550-51.  Because it concluded that plaintiffs did not show the existence of a fiduciary or other relationship which would give rise to such a duty, the court held that plaintiffs could not proceed with their claims based on Arvey's alleged omissions.

---

[0]We note, however, that we do not decide at this time whether such a disclaimer would be effective.  One court has noted that "it would appear that the doctrine does not apply unless the projection at issue reflects an honestly held belief."  Gurfein v. Sovereign Group, 826 F.Supp. 890, 908 (E.D.Pa. 1993) (Pollak, J.).  Judge Pollak further remarked that if the rule were otherwise

> one could construct a completely inaccurate and fraudulent offering memorandum, yet be shielded from a fraud claim as long as there was language in the document cautioning investors of the specific risks.  To the extent that such a rule would allow, if not encourage, fraud and non-disclosure on the part of corporate actors, it clearly is not a viable application of the "bespeaks caution" doctrine.

Id. at 908 n.20.

24

We believe the district court's analysis misapprehends the issues presented by this case. We are dealing here with a situation in which Arvey, by authoring its opinion letters, has elected to speak regarding the transactions at issue. Plaintiffs allege that this speech was misleading because Arvey failed to include in its opinion letters information that, if included, would have undermined the conclusions reached in those letters. In contrast, the cases cited by the district court, as well as those cited by Arvey, for the proposition that attorneys may not be held liable for omissions absent a duty to disclose concern the question of whether a law firm or similar entity has a duty to "blow the whistle" on its client. See Fortson v. Winstead, McGuire, Sechrest & Minick, 961 F.2d 469 (4th Cir. 1992); Abell v. Potomac Ins. Co., 858 F.2d 1104 (5th Cir. 1988), cert. denied sub nom. Abel v. Wright, Lindsey & Jennings, 492 U.S. 918 (1989); Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490 (7th Cir. 1986). That is, those cases concerned situations where the alleged omissions were unrelated to the validity of the law firm's opinion letter or similar communication.

Fortson, for example, concerned a suit against a law firm that had prepared a tax opinion letter that was included in the private placement memorandum used in the offering of interests in a real estate limited partnership. Plaintiffs "sought to recover from Winstead on the ground that the firm breached its duty under federal securities laws and state common law by failing to inquire into and ensure complete and accurate disclosure." Fortson, 961 F.2d at 471. Plaintiffs did not

25

allege that the tax opinion was inaccurate. "Instead, they challenge[d] the sufficiency of the information provided to them as potential investors and contend[ed] that Winstead had a responsibility to ensure full and accurate disclosure." Id. at 472. The court refused to impose this obligation on law firms in the absence of a fiduciary relationship between the law firm and the plaintiffs. Id. at 472-74. To do so, the court remarked, would be to make attorneys "guarantors of integrity in all commercial transactions, whether the context be one of raising capital, marketing a product, or negotiating a contract. Lawyers, in short, would function in the business world as designated watchdogs." Id. at 475. See also Barker, 797 F.2d at 496 ("When the nature of the offense is a failure to 'blow the whistle', the defendant must have a duty to blow the whistle. And this duty does not come from § 10(b) or Rule 10b-5; if it did the inquiry would be circular. The duty must come from a fiduciary relation outside securities law.").

This case, in contrast, presents the question of whether, once a law firm has chosen to speak, it may omit facts material to its non-confidential opinions. Here, unlike Fortson, the allegedly omitted facts bear directly on the accuracy of the tax opinion. Thus, this situation closely resembles that before the Seventh Circuit in Ackerman v. Schwartz, 947 F.2d 841 (7th Cir. 1991). In Ackerman investors brought suit against a law firm that wrote an opinion letter concluding that the investors were entitled to certain deductions for their investments in a tax shelter. The opinion letter recited facts that made the

transaction seem legitimate, but were fictitious.  The letter cautioned that the firm had "relied on unnamed persons for unspecified facts," id. at 843, and added that "'[w]e have not made an attempt to independently verify the various representations.'"  Id.  The court held that the district court's grant of summary judgment in favor of the law firm was improper.

> Under Rule 10b-5 ... the lack of an
> independent duty does not excuse a material
> lie.  A subject of a tender offer or merger
> bid has no duty to issue a press release, but
> if it chooses to speak it must tell the truth
> about material issues.  Although the lack of
> duty to investors means that Schwartz had no
> obligation to blow the whistle, and none to
> correct a letter he had not authorized to be
> circulated in the first place ... Schwartz
> cannot evade responsibility to the extent he
> permitted the promoters to release his
> letter.

Id. at 848 (citations omitted).

This analysis flows naturally from Eisenberg.  There we held that an opinion is actionable if issued "with a lack of a genuine belief that the information disclosed was accurate and complete in all material respects."  766 F.2d at 776.  Indeed, when the foundations of an opinion "suggest that they cannot be relied on without further inquiry, then the failure to investigate further may 'support an inference that when the defendant expressed the opinion it had no genuine belief that it had the information on which it could predicate that opinion.'"  Id. (citations omitted).  Thus, this court has adopted a limited duty to investigate and disclose when, by the drafter's omission, a public opinion could mislead third parties.

27

This limited duty not to omit was particularly well-articulated in Rose v. Arkansas Valley Envtl. & Util. Auth., 562 F.Supp. 1180, 1206-08 (W.D.Mo. 1983). The Rose court, in holding that an attorney's failure to disclose material facts in a bond opinion letter formed the basis of an actionable securities fraud claim, explained that when a professional "undertakes the affirmative act of communicating or disseminating information," there is

> a general obligation or "duty" to speak truthfully; or, alternatively stated, a "duty" not to communicate something which is known to be untrue (or, perhaps, in which the defendant has so little basis for honest belief that the requisite degree of "recklessness" is involved). And encompassed within that general obligation is also an obligation or "duty" to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated. While this latter "duty" might loosely be described as a "duty to disclose," I would prefer, for purposes of distinguishing it from a true "duty to disclose," ... to label it as a "duty not to omit." In reality, it is simply one facet of the general obligation to speak truthfully, arising out of and because of an affirmative act by the defendant in communicating.

Id. at 1207 (citations omitted).

The record contains evidence sufficient to preclude summary judgment on the omissions claim. Arvey received inquiries concerning its opinion letter from potential investors prior to issuing its second letter and was explicitly told prior to issuing its third letter that First Western was distributing copies of its letters along with brochures describing the

28

program.  Plaintiffs have alleged that Arvey failed to disclose the SEC and State of Minnesota investigations as well as the IRS investigation into the analogous Price trading program.  This evidence creates genuine issues of material fact sufficient to defeat Arvey's motion for summary judgment.

Finally, we must address Arvey's argument that a duty not to omit runs against the ethical standards of attorney conduct.  This argument is unpersuasive.  Privileges and ethical rules cannot be relied on to perpetrate fraud.  See Clark v. United States, 289 U.S. 1, 15 (1933) ("The privilege takes flight if the relation is abused.  A client who consults an attorney for advice that will save him in the commission of a fraud will have no help from the law.  He must let the truth be told.").

IV.

For the foregoing reasons, we will reverse the district court's decision granting summary judgment for Arvey on plaintiffs' claim that Arvey's tax opinion letters contained material omissions upon which plaintiffs relied.  We will affirm the district court's opinion in all other respects, and will remand for proceedings consistent with this opinion.

Kline v. First Western Government Securities

Nos. 92-1498, 92-1499

GREENBERG, Circuit Judge, dissenting.

This case raises the issue of when a law firm may be liable to third parties for misrepresentations and omissions in opinion letters written by the firm to its client. I am unable to join in the majority's opinion because the explicit disclaimers in the opinion letters, portions of which the majority quotes, made the plaintiffs' reliance on these letters unreasonable as a matter of law. Therefore, I would reverse the order of the district court to the extent that it denied the firm summary judgment, would affirm the order to the extent that it granted the firm summary judgment, and would remand the matter for entry of summary judgment in favor of the firm against the plaintiffs on the claims involved on this appeal. My dissent addresses only the reasonable reliance issue as described on pages 18 through 24 of the typescript of the majority opinion and the accompanying footnotes, as in my view that issue is dispositive.

As germane on this appeal, the plaintiffs alleged that the law firm, Arvey, violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The plaintiffs focus their attack on Arvey on the factual descriptions of First Western's program contained in Arvey's opinion letters. The plaintiffs contend that these

descriptions are inaccurate as a result of both misrepresentations and omissions. They further allege that as a consequence of Arvey's misrepresentations and omissions, they suffered adverse tax consequences upon the cancellation of losing forward contracts because the Internal Revenue Service disallowed the deductions they claimed based on these losses. Indeed, the relationship of the plaintiffs' claims to the tax portions of Arvey's opinions is demonstrated by the district court's holding of this case on its suspense calendar pending the outcome of litigation in the Tax Court regarding deductions for losses upon the cancellation of losing forward contracts arranged by First Western. The district court activated this case after the taxpayers were unsuccessful in that forum. See Freytag v. Comm'r, 89 T.C. 849 (1987), aff'd, 904 F.2d 1011 (5th Cir. 1990), aff'd, 111 S.Ct. 2631 (1991).[0] The plaintiffs, however, were not parties to that Tax Court case. Instead, they settled their cases with the Internal Revenue Service.

Arvey responds to the plaintiffs' charges by urging that the plaintiffs could not have relied justifiably on the opinion letters, as the letters: (1) explicitly addressed assumed facts; (2) stated that these facts had been provided by the client; and (3) stated that the firm furnished the opinion to First Western and it should not be relied upon by persons other than First Western. Thus, Arvey argues that the district court

---

[0]The Supreme Court did not deal with the merits of the controversy. The opinion of the Court of Appeals contains a succinct description of the First Western program. 904 F.2d at 1013-14.

erred in concluding that the qualifying language in the opinion letters did not shield it from liability as a matter of law. I agree.

I recognize that it is well settled that projections, forecasts, and opinions may be actionable under Rule 10b-5 if the declarant makes them without a genuine belief in their validity or a reasonable basis to believe in their accuracy. In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 368, (3d Cir. 1993), cert. denied, 114 S.Ct. 1219 (1994); Herskowitz v. Nutri/System, Inc., 857 F.2d 179, 184 (3d Cir. 1988), cert. denied, 489 U.S. 1054, 109 S.Ct. 1315 (1989); Eisenberg v. Gagnon, 766 F.2d 770, 775-76 (3d Cir.), cert. denied, 474 U.S. 946, 106 S.Ct. 342 (1985). As we explained in Eisenberg, "[a]n opinion must not be made 'with reckless disregard for its truth or falsity' or with a lack of a 'genuine belief that the information disclosed was accurate and complete in all material respects.'" 766 F.2d at 776 (citation omitted). Attorneys and other professionals are not exempt from this requirement, and courts have permitted the imposition of liability for securities fraud on professionals who knowingly or recklessly have issued false or misleading opinions. See, e.g., Id.; Duke v. Touche Ross & Co., 765 F. Supp. 69 (S.D.N.Y. 1991); Stevens v. Equidyne Extractive Indus., 694 F. Supp. 1057 (S.D.N.Y. 1988).

To state a violation of section 10(b) and Rule 10b-5, a plaintiff must allege that the defendant made (1) a misstatement or an omission (2) of material fact (3) with scienter (4) on which the plaintiff relied (5) and which proximately caused the

4

plaintiff's injury.  See, e.g., Hayes v. Gross, 982 F.2d 104, 106 (3d Cir. 1992); Shapiro v. UJB Fin. Corp., 964 F.2d 272, 280 (3d Cir.), cert. denied, 113 S.Ct. 365 (1992); Lewis v. Chrysler Corp., 949 F.2d 644, 649 (3d Cir. 1991); Straub v. Vaisman & Co., 540 F.2d 591, 598 (3d Cir. 1976).  Moreover, the plaintiff's reliance on the alleged misstatement or omission must be reasonable, even though the defendant has the burden of proof to show it was not reasonable.  Straub, 540 F.2d at 598. Consequently we have stated that to recover under section 10(b) and Rule 10b-5, "the plaintiff [must] act reasonably" and that "a sophisticated investor is not barred by reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced."  Id. (emphasis added).  Thus, "an investor cannot close his eyes to a known risk" and if he is "cognizant of the risk, then there is no liability."  Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir. 1985). Accordingly, a securities action defendant may obtain summary judgment by demonstrating that the plaintiff's reliance on the defendant's statements was unreasonable as a matter of law.

It stands to reason that where opinion letters regarding a potential investment -- even those prepared with scienter -- "bespeak caution," reasonable investors should not rely on the representations in them.  See Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986).  The majority concedes that "[m]ere reliance on the legal conclusions expressed in the opinion letters, without more, would have been unreasonable," but states that it was not unreasonable for plaintiffs to rely on Arvey's

5

descriptions of First Western's trading program although Arvey specifically attributed them to First Western and did not purport to have verified them. Typescript at 20-21. Thus, the majority holds that the "bespeaks caution" doctrine applies only "to the extent that plaintiffs relied solely and without further investigation or consideration on the opinion letters' conclusions as to the tax consequences of the First Western transactions" because the language in the letters would not have alerted plaintiffs that Arvey knew or had reason to know that the descriptions were inaccurate. Id. at 22-24. The majority's suggestion that the plaintiffs could reasonably rely on Arvey's opinion letter because "Arvey's statement that its opinion was based on facts represented to it by First Western . . . contained the implicit assertion that Arvey did not know the facts to be otherwise" improperly equates scienter with reasonable reliance. Id. at 23. These requirements are two independent elements which must be alleged to state a primary violation of section 10(b) and Rule 106-5.

Consequently, warnings and disclaimers -- by limiting the extent to which an investor can rely on the offering documents -- will preclude recovery for securities fraud even when the defendant's scienter has been established. "Dismissal of securities fraud claims may be appropriate where the offering documents specifically warn plaintiffs not to rely on the alleged misrepresentations made by defendants, thus making any subsequent reliance unjustified." Griffin v. McNiff, 744 F. Supp. 1237, 1253 (S.D.N.Y. 1990), aff'd, 996 F.2d 303 (2d Cir. 1993) (table).

6

For this reason, several courts have dismissed cases similar to this one on the ground that it was unreasonable for the investor to have relied on representations in the challenged opinion letter in the face of the letter's broad disclaimers or its attribution of the facts it recites to a third party.

For example in Buford White Lumber Co. v. Octagon Properties, Ltd., 740 F. Supp. 1553 (W.D. Okla. 1989), the plaintiffs brought a securities fraud suit against the law firm that had prepared the offering memorandum for the limited partnerships in which they had invested. The memorandum stated that the principals of the limited partnership and not the law firm had prepared the historical and financial statements and that the firm had not audited these statements. 740 F. Supp. at 1561. Accordingly, the court held that

> [i]n the face of these disclaimers and disclosure of the limited undertaking of defendant with respect to information or matters disclosed in the offering memorandum, it would be unforeseeable as a matter of law to a prudent law firm in Defendant's position that potential purchasers, including Plaintiffs, would rely upon Defendant's nondisclosure of any misrepresentations or omissions in the financial statements of [the limited partnership] as a representation by Defendant that the statements were accurate by reason of which Plaintiffs might be harmed. . . . The Offering memorandum states that the financial statements were prepared by and were the sole responsibility of [the limited partnership]. In short, Defendant did not undertake to prepare, evaluate the accuracy of, or opine upon the accuracy of financial statements by [the limited partnership] and said so.

7

740 F. Supp. at 1563. The court then went on to explain:

> [i]n the face of the statements in the Offering Memorandum that the financial statements were the sole responsibility of [the limited partnership] and were unaudited, and disclosures concerning the limited role of Defendant in preparing or evaluating statements made in the Offering Memorandum, the Court agrees with Defendant that any reliance by Plaintiffs on Defendant's duty to disclose inaccuracies, misrepresentation or omissions of [the limited partnership] in information it supplied is unreasonable as a matter of law.

Id. at 1666.

Numerous other courts have reached similar decisions. See, e.g., Moorhead v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 949 F.2d 243 (8th Cir. 1991) (holding that bond purchasers could not maintain securities fraud action against consultant that filed a feasibility study despite alleged misrepresentations, where study contained detailed cautionary language and specific warnings of risk factors, along with underlying factual assumptions); Luce v. Edelstein, 802 F.2d at 56 ("we are not inclined to impose liability on the basis of statements that clearly 'bespeak caution'" where offering memorandum warned investors that projections of potential cash and tax benefits were "'necessarily speculative'") (citation omitted); Friedman v. Arizona World Nurseries Ltd. Partnership, 730 F. Supp. 521, 541 (S.D.N.Y. 1990) (dismissing section 10(b) claims on ground that plaintiffs' reliance was unreasonable, where accountant's tax opinion stated that the projections contained therein were based on representations which were made

8

to the accountants by the promoter of the limited partnership), aff'd, 927 F.2d 594 (2d Cir. 1991) (table); O'Brien v. National Property Analysts Partners, 719 F. Supp. 222, 227-29 (S.D.N.Y. 1989) (holding that no liability attaches where accountant specifically attributes its financial assumptions to documents given to it by representatives of the limited partnership); Stevens v. Equidyne Extractive Indus. 1980, 694 F. Supp. at 1063-64 (dismissing securities fraud suit against accountant, because statements in accountant's opinion letter "set forth that they [were] based on supplied facts, [and] additionally state[d] that there is no implication that the results predicted can or will be achieved"); Feinman v. Shulman Berlin & Davis, 677 F. Supp. 168, 170-71 (S.D.N.Y. 1988) (holding that where "offering memorandum warned plaintiffs not to rely on the misrepresentations which the defendants allegedly made [,] plaintiffs' reliance on those misrepresentations, if made was unjustified and dismissal is appropriate")[0]; Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, 651 F. Supp. 877, 881 (D. Conn. 1986) (dismissing section 10(b) claims because the cautionary "language of the document in question limited the degree to which investors should rely on it" as it told investors that defendant accounting firm did not verify the data upon which its projections were based); Devaney v. Chester, Fed. Sec. L. Rep. (CCH) ¶ 92,747, at 93,649 (S.D.N.Y. 1986), rev'd on other grounds, 813 F.2d 566, 569 (2d

_____

[0] In my view, Friedman and Feinman are particularly significant because they dealt with caveats concerning the tax consequences of the transactions and, as here, warned that the IRS might challenge the tax assumptions underlying the investments.

9

Cir. 1987) (dismissing securities fraud claim against investment bank because the confidential memorandum it prepared "with its broad disclaimers as to the source of information contained therein, does not support an allegation of reliance. Investors would not be likely to rely on memoranda which so definitely stated their dependency on another source").[0]

Like the law firm in Buford White Lumber Co., Arvey made it clear that it did not undertake to guarantee to potential investors the accuracy of the factual information contained in its letters. Arvey also made it clear that it was not offering advice to such investors. Each of the opinion letters is addressed to Sidney Samuels as president of First Western, and is stated to be for the exclusive use of Samuels or First Western. The 1980 opinion letter emphasizes this point most strongly. It warns that it "supersedes our letter of June 8, 1979, upon which, as you were previously informed, you should no longer rely," App. at 576, and contains an even more forceful cautionary statement than the earlier letters that:

> [t]his letter is intended solely for the internal use of First Western and, accordingly, it is not intended to be, and should not be, relied upon by any person other than First Western. Further, this letter is not to be quoted or otherwise referred to in any documents, including

[0]The Court of Appeals for the Second Circuit reversed the district court's judgment on the ground that the court should have permitted the plaintiffs to file an amended complaint. This holding, however, did not cast doubt on the district court's determination that reliance is unjustified where the document at issue contains cautionary language and represents that the source of the information contained therein came from a third party.

10

> financial statements of First Western, nor is it to be filed with or furnished to any governmental agency or other person without the express prior written consent of this firm.

Id. at 590-91.

Furthermore, the opinion letters were replete with cautionary language. All three warned that the IRS and the courts might "take a strong stance contrary to the opinion expressed herein." Id. at 147 (1978 letter), 574 (1979 letter), 591 (1980 letter).[0] Indeed, the 1980 opinion letter disclosed that the IRS was investigating First Western's customers for engaging in tax avoidance transactions and that the IRS generally viewed the simultaneous holding and selling of forward contracts with suspicion. The letter stated that:

> Rev. Rul. 77-185 is part of a concerted effort by the Service to curb what it considers the abusive use of offsetting positions in securities and commodities to minimize or defer tax liability. In addition to promulgating Rev. Rul. 77-185, the Service has added Chapter 700 ('Commodity Options and Futures') to its Tax Shelters Examination Handbook, in which it identifies, among other transactions, 'the simultaneous buying and selling of futures contracts in . . . GNMA Certificates' as a 'basic tax shelter arrangement.' The Service has also announced a policy of identifying for audit returns which contain significant securities and commodities transactions, and is presently litigating various cases involving transactions similar to those involved in Rev. Rul. 77-185. Due to the Service's concern with transactions similar to those

---

[0] The plaintiffs made their investments in December 1980 after they read Arvey's 1979 and 1980 letters.

11

> entered into between First Western and its
> customers, persons who enter into
> transactions with First Western may
> substantially increase their chances of being
> audited by the Service. Further, you have
> informed us that customers of First Western
> are being audited by the Service and that the
> Service has questioned the deductibility of
> losses realized by such customers on the
> basis of the theory set forth by the Service
> in Rev. Rul. 77-185.

App. at 588 (emphasis added). This warning, in no uncertain terms, put potential investors who read Arvey's letters, including the plaintiffs, on notice of the strong possibility that the IRS would disallow deductions by investors of any losses resulting from the cancellation of First Western contracts on the ground that the transactions were really only a tax avoidance scheme. Of course, that is exactly what happened. Furthermore, the 1980 letter disclosed First Western's troubled past by discussing the IRS's audits of prior First Western transactions identical to those analyzed in the opinion letters. Thus, the plaintiffs cannot state a claim of misrepresentation because the facts upon which their claim is premised were disclosed clearly. "[T]he naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud." Spiegler v. Wills, 60 F.R.D. 681, 683 (S.D.N.Y. 1973).[0] Furthermore, in the face of this disclosure,

---

[0]The cases I have cited do not always distinguish among the related concepts that a statement may be so conditioned that: (1) it cannot be regarded as misleading; (2) the representations it contains may not be material; and (3) reliance on the statement may be unreasonable. Nevertheless all support the conclusion that the plaintiffs' reliance in this case was unreasonable.

it was unreasonable for the plaintiffs to rely on the Arvey letters as support for the validity of deductions for ordinary losses upon the cancellation of a losing forward contract.

In addition to warning of the possible non-deductibility of losses resulting from the purchase of First Western's forward contracts, the opinion letters clearly indicated that they depended on assumed facts. In this regard, the letters prefaced their factual description of First Western's trading programs with the following introductory remarks, attributing the descriptions to Samuels: "the following paragraphs contain a summary of such transactions as you have described them to us," App. at 135 (1978 letter); "you have advised us that the facts set forth below constitute an accurate and complete presentation of all relevant information with regard to such transactions," Id. at 558 (1979 letter); and "you have advised us that the facts set forth below constitute an accurate and complete presentation of all relevant information with regard to the transactions between First Western and its customers, and that no material fact necessary to make the information herein not false or misleading has been omitted," Id. at 576 (1980 letter).

Furthermore, almost every specific factual description of how the First Western trading program functioned began with the phrase "you have represented to us. . ." or the equivalent. For example, both the 1979 and 1980 letters included the following statements:

13

you have represented to us that the various combinations of forward contracts obligating the customer to deliver and take delivery of money market instruments will, as described above, have sufficiently different stated interest rates and delivery dates so as to produce independent price movement among such contracts and cause the customer to have a reasonable opportunity of realizing economic gain (and a corresponding risk of loss) <u>with respect to his various positions</u>.[0]

Id. at 560-61, 577 (1979 and 1980 letters).

You have represented to us that the transactions entered into by First Western and its customers will reflect the customer's market strategy and interest rate forecast, <u>will have economic validity independent of their respective tax consequences</u>, and will <u>produce a reasonable opportunity for economic gain and risk of economic loss</u>.

Id. at 573 (emphasis added) (1979 letter).

In addition, this opinion is subject to the consummation of the transactions between First Western and its customers pursuant to the facts and conditions <u>described above</u> and is further expressly conditioned on <u>your representation</u> that such transactions will be consummated by the customers of First Western with a reasonable expectation of economic gain.

Id. at 563 (emphasis added) (1979 letter).

Thus, Arvey's opinion letters, like those in the above cited cases, expressly noted that Samuels and First Western, not Arvey, supplied the facts, that even under those facts there was no guarantee that the results predicted would be achieved, and that the letters should not be relied upon by the investors.

---

[0] The words which I have underscored read as follows in the 1980 letter: "with respect to his overall position."

14

Given all of this cautionary language, the plaintiffs should not have understood the opinion letters to mean that Arvey had made factual representations regarding First Western's programs.  I would therefore hold that the plaintiffs' could not have relied reasonably on the opinion letters as to the accuracy of the factual descriptions they contain, or indeed anything else, and thus no liability may be imposed on Arvey.

I have demonstrated already that the plaintiffs' reliance on the opinion letters was unreasonable.  But there is even more evidence to support this conclusion, as the 1980 letter also includes a veritable bugle blast of an announcement cautioning investors not to rely on Arvey's opinion:

> [h]owever, as discussed in more detail below, the deductibility of any particular customer's losses may depend upon certain facts and circumstances related to such customer's account with First Western at the time the loss is incurred.  <u>Accordingly, it is impossible for us to express an opinion as to the deductibility of any particular loss incurred by a customer of First Western</u>.

<u>Id</u>. at 586 (emphasis added).  In view of the foregoing statement, the plaintiffs' reliance on Arvey's letters was not simply unreasonable.  It was reckless.  I believe that it is absolutely clear that the plaintiffs could not have relied reasonably on an opinion letter to justify tax deductions when the letter indicates that  "<u>it is impossible for us to express an opinion as to the deductibility of any particular loss incurred by a customer of First Western</u>."

15

An examination of the factors which we said in Straub should be considered when determining whether a plaintiff justifiably relied on the defendant's misrepresentations reinforces my conclusion, though I hasten to add that it is so obvious that the plaintiffs' reliance on Arvey's letters was unreasonable that I could stop my dissent at this point. 540 F.2d at 598. But I will go on. There are five Straub factors: (1) the existence of a fiduciary relationship; (2) the plaintiffs' opportunity to detect the fraud; (3) the sophistication of the plaintiffs; (4) the existence of a long-standing business or personal relationship; and (5) access to the relevant information. Id. In regard to the first and fourth factors, Arvey clearly had no special relationship with the plaintiffs that would give the plaintiffs any grounds to trust Arvey's representations or that would impose on Arvey any duty to inform the plaintiffs of possible inaccuracies. Indeed, the majority acknowledges this point. See typescript at 20.

As to the other factors, we must remember that we are not dealing with plaintiffs who made conventional investments. Straddle transactions are not designed for the proverbial "person on the street." To the contrary, the transactions discussed in the opinion letters involved very complex financial arrangements meant for sophisticated investors looking for tax advantages. The mere fact that these transactions were on the cutting edge of strategic tax planning should have put any reasonable investor on notice that there was a substantial risk of tax complications. Furthermore, the various disclosures in the letters should have

16

provided the plaintiffs with the incentive and opportunity to detect possible fraud.  As I explain above, the letters not only made it clear that they were predicated on facts provided by Samuels, and not verified by Arvey, but they also disclosed past instances in which the IRS questioned the validity of transactions identical to those discussed in the letters, and indicated that it was likely there would be future trouble as well.  Thus, the letters gave the plaintiffs every incentive to make further inquiries into the legitimacy of the First Western program and should have caused them to withhold their investments until they had the information necessary to make informed decisions.  In sum, the application of the Straub factors dictates the conclusion that an investor could not justifiably rely on the representations contained in Arvey's opinion letters.

In rejecting this conclusion, the majority writes that there is no evidence that these plaintiffs had any particular knowledge or sophistication which would enable them to notice any irregularities in First Western's programs.  Id. at 20.  The majority notes further that reliance on the letters might be justified because an investor could take the letters to an attorney and, predicated on the facts in them, obtain an erroneous opinion.  Id. at 20-21.

But the opinion letters made it clear that the facts they contained originated from First Western, not Arvey. Although another attorney might have agreed with the legal analysis in the opinion letters, there is no way that another attorney could have confirmed from the letters themselves that the facts underlying

17

the opinions were correct as they were solely within the knowledge of First Western. Any reasonable person reading the letters would have realized this and questioned the reliability of the factual descriptions of First Western's trading practices and, in particular, the statements regarding the independent economic validity of the transactions. Furthermore, as I noted above, the 1980 opinion letter states that investors are not to make an investment decision based on the letter, but if they do, they should at least obtain written permission from Arvey. This admonishment should have pounded home to the plaintiffs the risk that they were taking.

I emphasize that it is critically important to focus on the precise nature of the plaintiffs' claims, because the reasonableness of the plaintiffs' reliance cannot be considered in the abstract. The precise issue is whether the plaintiffs could rely reasonably on the letters in considering the tax consequences of canceling a forward contract. As the plaintiffs explain in their opening brief at 5, "[t]he focus of each opinion letter was the federal income tax treatment of a loss sustained by a First Western customer upon the cancellation of a losing forward contract (a 'loss contract') prior to the contract's settlement date." In particular, the plaintiffs claim that Arvey mislead them because its opinion letters said that they would have ordinary losses when canceling losing forward contracts.[0]

---

[0]Actually, it never has been established that this advice was wrong. While the Tax Court ruled against other investors in the First Western program, and its decisions were affirmed on the merits by the Court of Appeals for the Fifth Circuit, the

18

In the face of this claim, I ask the rhetorical question: how can an investor reasonably rely on opinion letters to anticipate favorable tax treatment when they: (1) are addressed to someone else; (2) are by their terms only for the use of someone else; (3) by their terms cannot be shown to the investor; (4) are predicated on facts not supplied by the author of the letters; (5) warn that the IRS likely will challenge the claim for favorable treatment as it has in similar situations; (6) explain the basis for the challenge; (7) state that the courts might take a strong stance contrary to the opinion; and (8) flatly announce that it is "impossible" for the author of the letter "to express an opinion as to the deductibility of any particular loss incurred by" an investor? The answer is obvious. The investors could not rely reasonably on such letters, and thus Arvey is entitled to summary judgment on the Section 10(b) claims.[0] In my view, nothing could be clearer.

Surely if there ever was any doubt as to Arvey's right to a summary judgment, it did not survive our recent opinion in

plaintiffs were not parties to that case. For all that we know, it is possible that if the plaintiffs had not chosen to settle with the IRS, they might have prevailed in litigation in either the Tax Court or in a different court of appeals. Courts of appeals, after all, do not always view identical tax issues similarly. See Pleasant Summit Land Corp. v. Comm'r., 863 F.2d 263, 265 n.2. (3d Cir. 1988), cert. denied, 493 U.S. 901, 110 S.Ct. 260 (1989). I acknowledge, however, that probably the plaintiffs would have lost and I further recognize that the Freytag case was a "test case." Freytag, 904 F.2d at 1014. Of course, my opinion is not dependent on whether Arvey's opinion was right or wrong.
[0]Of course, there is no dispute of fact precluding summary judgment, as the plaintiffs do not contend that the opinion letters do not contain the provisions I have quoted.

19

In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357.  In Trump, as in this case, the plaintiffs asserted a Section 10(b) action.[0] The action arose from the sale of bonds by the defendants to acquire, complete the construction of, and open a gigantic casino in Atlantic City, New Jersey.  The plaintiffs were purchasers of the bonds who claimed that in making their purchases they relied on false statements in the prospectus.  The plaintiffs also asserted that material matters were omitted from the prospectus.  The defendants successfully moved to dismiss under Fed. R. Civ. P. 12(b)(6), as the complaint failed to state a claim on which relief could be granted.

On appeal we affirmed on the basis of the "bespeaks caution" doctrine.  We pointed out that the prospectus was so filled with cautionary language that the allegedly misleading statements became immaterial as a matter of law.  Trump, 7 F.3d at 371-73.  I will not set forth the representations and cautionary language in Trump, for I see no need to do so. Rather, I indicate only that it seems obvious that the facts in Trump gave the investors a stronger claim for recovery than the facts in this case give the plaintiffs here.  Yet in Trump we affirmed the order of the district court granting the defendants judgment under Rule 12(b)(6).

I acknowledge that in Trump we held that the cautionary language rendered the alleged misrepresentation immaterial as a matter of law while here we are concerned with whether the

---

[0] Trump also involved other counts which we need not describe.

20

plaintiffs reasonably relied on Arvey's opinion letters. But this distinction makes no difference. The point is that the cautionary language in the Trump prospectus should have hammered home to the investors the risk they were taking. Precisely the same thing is true here. The plaintiffs here could not rely reasonably on documents which by their terms were not for their view and which were conditioned so thoroughly. While it is true, as the majority points out, that Arvey may have known that investors would see the letters, that knowledge is immaterial to the question of reasonable reliance, a determination that must be predicated on what should be the investor's state of mind. Thus, I do not urge that we hold that Arvey did not misrepresent.[0] Rather, I would hold Arvey has demonstrated that the plaintiffs unreasonably relied on its opinion letters.

By its holding that there is a triable issue as to whether the plaintiffs' reliance on the Arvey letters was reasonable, the majority effectively holds that no matter how thoroughly a law firm conditions its opinion, it may be liable to the investors in a Section 10(b) action for misrepresentation and omissions. In this circuit there now will be no safe harbor for attorneys in the sea of Section 10(b) cases. The majority's holding thus cannot be reconciled with the warnings, recently made by the Court of Appeals for the Fourth Circuit, that where, as here, a law firm has "unequivocally informed potential

---

[0] Of course, on the basis of Trump and the other opinions I have cited, we could hold that there were no misrepresentations, but even if there were, they were not material. But I am not taking that approach.

21

investors that the law firm had not verified the financial data provided to it by the client[,] . . . [t]o find a duty in the face of this express disclaimer of verification would render law firms powerless to define the scope of their involvement in commercial transactions."  See Fortson v. Winstead, McGuire, Sechrest, & Minick, 961 F.2d 469, 475 (4th Cir. 1992).  I cannot conceive of more explicit disclaimers than Arvey's.  If such disclaimers cannot permit a law firm to foreclose the possibility of imposition of liability on it to outside parties for issuing a written opinion to a client, then nothing will.  The result of the majority's position is therefore "a rigid rule charging all attorneys who involve themselves in any narrow corner of a commercial transaction with responsibility for the whole transaction" even when they expressly disclaim any such involvement.  Id.

Furthermore, as a practical matter, the majority opinion has eliminated the justifiable reliance element of Section 10(b) actions which hereafter in this circuit will exist only in theory.  The opinion will have far-reaching consequences in this circuit and perhaps beyond because in our national economy attorneys anywhere may recognize that in some securities transactions litigation in this circuit may materialize.  The opinion should lead knowledgeable commercial attorneys in situations in which the Securities Exchange Act may become implicated to be reluctant to advise anyone about anything which could affect the rights of investors or the value of the securities.  Indeed, I see no principled way to limit the

majority's decision to opinions given by attorneys.  Accordingly,

I dissent.