892 F.Supp. 676 (1995)
In re PHAR-MOR, INC. SECURITIES LITIGATION.
GIANT EAGLE OF DELAWARE, INC.; Gerald E. Chait; Stanley Moravitz; Irwin Porter; Farrell Rubenstein; David S. Shapira; Norman Weizenbaum; and Giant Eagle, Inc., Plaintiffs,
v.
COOPERS & LYBRAND and Eugene M. Freedman, William K. O'Brien, Larry S. Schumer, John Henry Cynkar, Robert Scott Williams, Richard L. Baird, John E. Easton, Philip H. Reed, Jr., V.M. O'Reilly, John J. Roberts, Steven L. Skalak, Robert T. Caruso, Bjorn Hanson, William F. Buettner, Jr., Gregory S. Finerty and Richard E. Sherman, on Behalf of Themselves and as Representatives of a Class of Partners and Principals of Coopers & Lybrand, Defendants.
Civ. A. Nos. 92-1938, 92-2269. MDL No. 959. Master No. Misc. 93-96.
United States District Court, W.D. Pennsylvania.
June 20, 1995.
*677 *678 *679 *680 Bernard D. Marcus, Pittsburgh, PA, for Giant Eagle.
Robert J. Sisk, New York City, for Coopers-Lybrand.

OPINION
ZIEGLER, Chief Judge.
Pending before the court is the motion of defendant, Coopers & Lybrand ("Coopers"), for summary judgement with respect to the claims asserted by plaintiffs, Giant Eagle of Delaware, Inc. ("GE Delaware"), Giant Eagle, Inc. ("Giant Eagle"), and six members of the Board of Directors of Phar-Mor, Inc. ("Phar-Mor"), namely, Gerald E. Chait, Stanley Moravitz, Irwin Porter, David S. Shapira, Farrell Rubenstein and Norman Weizenbaum (collectively referred to as "the PM Directors").[1]
This action stems from the financial fraud that was perpetrated by certain officers of Phar-Mor during the late 1980's and early 1990's. It is one of over forty actions which have been consolidated in this court as part of the multidistrict litigation styled In re Phar-Mor, Inc. Securities Litigation, MDL No. 959. The fraud at Phar-Mor, a deep discount drugstore chain, was allegedly masterminded by Michael I. Monus, its former Chief Operating Officer, and Patrick B. Finn, its former Chief Financial Officer.[2] As a result of the fraud, Phar-Mor's financial statements falsely reflected a profitable business when, in fact, Phar-Mor was operating at a substantial loss.[3] Shortly after the fraud was revealed in August of 1992, Phar-Mor filed a petition for relief under Chapter 11 of the Bankruptcy Code.
Giant Eagle, a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania, is a privately-held company that operates a chain of supermarkets in Pennsylvania, West Virginia and Ohio. GE Delaware, a Delaware corporation with its principal place of business in Wilmington, Delaware, is a wholly-owned subsidiary of Giant Eagle. Each of the PM Directors are residents of Pennsylvania with the exception *681 of Norman Weizenbaum, who is a resident of Florida.
Coopers, a partnership established under the laws of New York, is an international public accounting firm. Coopers served as Phar-Mor's outside auditor from 1984 until August 1992. Coopers also served as the outside auditor for Giant Eagle for approximately twenty years until its services were terminated in August 1992. The audits of both Phar-Mor and Giant Eagle were performed by auditors working out of Coopers' offices located in Pittsburgh, Pennsylvania. All of the auditors that worked on the particular audits at issue here, namely, the audits of Phar-Mor and Giant Eagle for the fiscal years 1989, 1990 and 1991, were licensed by the Commonwealth of Pennsylvania.[4]
GE Delaware and the PM Directors are purchasers of over $100 million of Phar-Mor stock. We have separated the purchases into four categories. The first category ("Prefraud Purchases") consists of purchases made "pre-fraud," or those purchases made prior to fiscal year 1989.[5] The second category ("1989 PPM Purchases") consists of those purchases made in Phar-Mor's private placement stock offering of November 1989. In the November 1989 offering, 460,000 shares were offered at $175.00 per share for a total offering price of $80,500,000.00. The offer was made by way of a November 1, 1989, private placement memorandum ("PPM") which, with Coopers' authorization, contained a copy of Coopers' fiscal 1989 Phar-Mor audit report. The third category ("1990 PPM Purchases") consists of those purchases made in Phar-Mor's private placement stock offering of September 1990. In the September 1990 offering, 4,000,000 shares were offered at $20.00 per share for a total offering price of $80,000,000.00. The offer was made by way of a September 13, 1990 PPM, which contained a copy of Coopers' fiscal 1990 Phar-Mor audit report. The fourth category ("FY 89-91 Purchases") consists of purchases which were made during fiscal years 1989 through 1991 that were not purchased as part of a private placement offering. These include the exercise of stock options.
The following chart summarizes the purchases of GE Delaware and the PM Directors:[6]

 1. Gerald E. Chait:
 Pre-fraud Purchases $ 520,000.00
 1989 PPM Purchases -NONE-
 1990 PPM Purchases -NONE-
 FY 89-91 Purchases 144,500.00
 ___________
 TOTAL PURCHASES $ 664,500.00
 ==============
 2. GE Delaware:
 Pre-fraud Purchases $26,456,240.00
 1989 PPM Purchases 25,535,475.00
 1990 PPM Purchases 25,000,000.00
 FY 89-91 Purchases 19,999,980.00
 ______________
 TOTAL PURCHASES $96,991,695.00
 ==============
 3. Stanley Moravitz:
 Pre-fraud Purchases $ 150,000.00
 1989 PPM Purchases 35,000.00
 1990 PPM Purchases 220,000.00
 FY 89-91 Purchases 152,170.00
 ______________
 TOTAL PURCHASES $ 557,170.00
 ==============

*682
 4. Stanley & Flo Moravitz:
 Pre-fraud Purchases $ 62,000.00
 1989 PPM Purchases -NONE-
 1990 PPM Purchases 20,000.00
 FY 89-91 Purchases 27,000.00
 ______________
 TOTAL PURCHASES $ 109,000.00
 ==============
 5. Irwin Porter:
 Pre-fraud Purchases $ 136,380.00
 1989 PPM Purchases 70,000.00
 1990 PPM Purchases -NONE-
 FY 89-91 Purchases 197,080.00
 ______________
 TOTAL PURCHASES $ 403,460.00
 ==============
 6. Farrell Rubenstein:
 Pre-fraud Purchases $ -NONE-
 1989 PPM Purchases -NONE-
 1990 PPM Purchases 100,000.00
 FY 89-91 Purchases -NONE-
 ______________
 TOTAL PURCHASES $ 100,000.00
 ==============
 7. David S. Shapira and Karen A. Shapira:
 Pre-fraud Purchases $ 2,900,000.00
 1989 PPM Purchases 49,875.00
 1990 PPM Purchases -NONE-
 FY 89-91 Purchases 152,170.00
 ______________
 TOTAL PURCHASES $ 3,102,045.00
 ==============
 8. Norman Weizenbaum:
 Pre-fraud Purchases $ 286,940.00
 1989 PPM Purchases -NONE-
 1990 PPM Purchases -NONE-
 FY 89-91 Purchases 259,580.00
 ______________
 TOTAL PURCHASES $ 546,520.00
 ==============
 9. Norman Weizenbaum trustee for L. Weizenbaum:
 Pre-fraud Purchases $ 77,470.00
 1989 PPM Purchases -NONE-
 1990 PPM Purchases -NONE-
 FY 89-91 Purchases -NONE-
 ______________
 TOTAL PURCHASES $ 77,470.00
 ==============

Giant Eagle is not a Phar-Mor shareholder. However, it claims that it entered into a myriad of business transactions with Phar-Mor in which it incurred, as a result of the fraud, expenses and liabilities totalling $258,153,507.00. Moreover, as rehearsed, Giant Eagle is the parent corporation of GE Delaware. Plaintiffs' expert valued GE Delaware's pre-fraud stock holdings at approximately $115 million as of June 30, 1988, and GE Delaware purchased over $70 million of additional shares during fiscal years 1989 and 1990.
Plaintiffs contend that, had Coopers not recklessly and improperly performed its audits of Phar-Mor during the fiscal years 1989 through 1991, it would have uncovered the fraud and plaintiffs would not have purchased shares of Phar-Mor stock during 1989 and 1990, or alternatively, would have purchased the shares at a considerably lower price. In addition, plaintiffs contend that Coopers' reckless audits precluded them from protecting their investments in Phar-Mor. Finally, Giant Eagle contends that if Coopers had uncovered the fraud, it would not have entered into the significant and ill-fated business transactions with Phar-Mor.
*683 Plaintiffs' six-count third amended complaint asserts claims for: (1) violations of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (by GE Delaware and the PM Directors); (2) violations of various state securities laws, including section 1-503 of the Pennsylvania Securities Act (by GE Delaware and the PM Directors); (3) common law fraud (by all plaintiffs); (4) negligent misrepresentation (by all plaintiffs); (5) professional malpractice (by Giant Eagle and GE Delaware); and (6) breach of contract (by Giant Eagle and GE Delaware).
Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, we must examine the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986).
The parties agree that Pennsylvania law controls the instant action. Pennsylvania has adopted the "most significant relationship test" set forth in section 145 of the Restatement (Second) of Conflict of Laws (1971). See, e.g., Griffith v. United Air Lines, Inc., 416 Pa. 1, 203 A.2d 796 (1964). Under this test, a court should apply the law of the state with the most significant contacts to the action and the strongest interest in the application of its law. In the case at bar, Pennsylvania has the most significant contacts, including (1) all of the plaintiffs, with the exception of GE Delaware and Norman Weizenbaum are residents of Pennsylvania; (2) Giant Eagle and Phar-Mor are incorporated under the laws of Pennsylvania and Giant Eagle has its principal place of business here; (3) the stock purchased by plaintiffs was issued and sold in Pennsylvania; (4) the Coopers auditors who worked on the Phar-Mor and Giant Eagle audits are licensed by the Commonwealth of Pennsylvania and these auditors worked out of Coopers' Pittsburgh office; (5) the relationship between the parties was centered in Pennsylvania; and (6) the audit reports were prepared at and disseminated from Cooper's Pittsburgh office. No other state has such significant contacts to the instant action and we will apply Pennsylvania law to plaintiffs' state law claims.[7]
Coopers initially argues that the claims of Giant Eagle and GE Delaware are defective because the fraud perpetrated at Phar-Mor is attributable to both corporations under the general rule that "the fraud of an officer of a corporation is imputed to the corporation when the officer's fraudulent conduct was (1) in the course of his employment, and (2) for the benefit of the corporation." Rochez Bros., Inc. v. Rhoades, 527 F.2d 880, 884 (3d Cir.1975), cert. denied, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). Under the imputation defense, a "participant in the fraud cannot also be a victim entitled to recover damages." Cenco Inc. v. Seidman & Seidman, 686 F.2d 449, 454 (7th Cir.1982), cert. denied, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982).
Coopers contends that Monus was a servant of Giant Eagle, subject to its direction and control and, therefore, his fraudulent actions must be imputed to the Giant Eagle corporations. Coopers points to the fact that Monus had a written employment agreement with Giant Eagle pursuant to which he served as Phar-Mor's President through the end of 1991. The agreement stated that Monus would "report to and be subject to the direction of the Chief Executive Officer of [Giant Eagle]." Further, the agreement provided that Giant Eagle would pay Monus' annual salary and bonus. Coopers submits that these factors establish as a matter of law that Giant Eagle remained in a master-servant relationship with Monus and did not relinquish its rights to control him.
Regardless of whether Coopers' argument respecting Monus' employment status *684 is meritorious, we reject Coopers' imputation defense for the same reason that we rejected, on summary judgment, the defense with respect to the claims asserted against Coopers by Phar-Mor, namely, the existence of genuine issues of material fact as to whether Monus, Finn and others were acting adversely to corporate interests. See, e.g., F.D.I.C. v. O'Melveny & Meyers, 969 F.2d 744 (9th Cir.1992) rev'd on other grounds, ___ U.S. ___, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). The factors establishing the existence of a jury question on the "adverse interest" exception are set forth in our opinion denying Coopers' summary judgment motion in Phar-Mor, Inc. v. Coopers, Civil Action No. 92-2108 (Opinion, June 1, 1995), and will not be restated here. We note, however, that the imputation defense is even less conducive to a summary dismissal with respect to the Giant Eagle plaintiffs because Monus, unlike Finn and the other alleged perpetrators, invoked his fifth amendment privilege and has not testified whether he intended, by his fraudulent acts, to benefit either Phar-Mor or the Giant Eagle corporations.
Coopers next argues that the claims of GE Delaware and the PM Directors under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 must be dismissed because (1) plaintiffs can offer no facts from which a jury could reasonably conclude that Coopers acted with scienter, and (2) it is partially untimely.
One of the requisite elements of a claim under section 10(b) of the 1934 Act and Rule 10b-5 is proof that the defendant acted with scienter. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380-81, 47 L.Ed.2d 668 (1976). In Ernst, the Supreme Court noted that:
the term "scienter" refers to a mental state, embracing intent to deceive, manipulate, or defraud. In certain areas of the law recklessness is considered to be a form of intentional conduct for purposes of imposing liability for some act. We need not address here the question whether, in some circumstances, reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b-5.
Id. at 194, n. 12, 96 S.Ct. at 1381, n. 12.
Three years after Ernst was decided, the Court of Appeals, following the leading case of Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033 (7th Cir.1977), cert. denied, 434 U.S. 875, 98 S.Ct. 224, 225, 54 L.Ed.2d 155 (1977), held that proof of reckless conduct could satisfy the scienter requirement. McLean v. Alexander, 599 F.2d 1190, 1197-98 (3d Cir.1979); see also, Coleco Industries, Inc. v. Berman, 567 F.2d 569 (3d Cir.1977), cert. denied, 439 U.S. 830, 99 S.Ct. 106, 58 L.Ed.2d 124 (1978). The Court of Appeals approved the formulation for recklessness set forth in Sundstrand, where "reckless conduct," as a minimum threshold for liability under section 10(b), was defined as:
highly unreasonable [conduct], involving not merely inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.
McLean at 1197 (brackets in original) (quoting Sundstrand at 1045).
The Court of Appeals further explained that, while "negligence  whether gross, grave or inexcusable  cannot serve as a substitute for scienter," a plaintiff can satisfy the scienter requirement by proving "that the defendant lacked a genuine belief that the information disclosed was accurate and complete in all material respects." Id. at 1198. The Court then stressed that:
to prove scienter the plaintiff need not produce direct evidence of the defendant's state of mind. Circumstantial evidence may often be the principal, if not only, means of proving bad faith. A showing of shoddy accounting practices amounting at best to a pretended audit, or of grounds supporting a representation so flimsy as to lead to the conclusion that there was no genuine belief back of it have traditionally supported a finding of liability in the face of repeated assertions of good faith, and continue to do so. In such cases, the factfinder may justifiably conclude that despite *685 those assertions the danger of misleading ... [was] so obvious that the actor must have been aware of it.
Id. at 1198 (internal citations and quotations omitted).
The Court of Appeals has, on a number of occasions, reaffirmed its holding that proof of recklessness suffices to state a federal cause of action under section 10(b). In Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir.1985), cert. denied, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985), the court stated that an "opinion [of an accountant] that has been issued without a genuine belief or reasonable basis is an `untrue' statement which, if made knowingly or recklessly, is culpable conduct under § 10(b) and Rule 10b-5." See also, Kline v. First Western Government Securities, Inc., 24 F.3d 480, 486 (3d Cir.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 613, 130 L.Ed.2d 522 (1994) (same); In re Phillips Petroleum Securities Litigation, 881 F.2d 1236, 1244 (3d Cir.1989) (recklessness on the part of a defendant meets the scienter requirement of Section 10(b) and Rule 10b-5); Sharp v. Coopers & Lybrand, 649 F.2d 175, 193 (3d Cir.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982) (the standard for scienter includes recklessness); Healey v. Catalyst Recovery of Pennsylvania, Inc., 616 F.2d 641, 649 (3d Cir.1980) (same).
Coopers argues that the above-cited authorities no longer provide an accurate statement of the law in view of the recent opinion of the Supreme Court in Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., ___ U.S. ___, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In that case, the Court held that civil liability under section 10(b) does not extend to parties who merely aid and abet the manipulative or deceptive practices. In reaching its holding, the Court relied on the fact that the statute did not expressly provide for aiding and abetting liability. The Court stated that: "[i]f ... Congress intended to impose aiding and abetting liability [under section 10(b)], we presume it would have used the words `aid' and `abet' in the statutory text. But it did not." Id., ___ U.S. at ___, 114 S.Ct. at 1448.
Coopers argues that under the holding in Central Bank, judicial extension of the statute to reach reckless conduct is unwarranted. In short, defendant contends that had Congress intended to make reckless conduct unlawful under section 10(b), it would have used the term "reckless" in the statute.[8]
Coopers has not cited any authority which supports the proposition that it espouses and the only case that we have found which addresses the issue, In re Leslie Fay Companies, Inc., 871 F.Supp. 686 (S.D.N.Y.1995), rejected the auditor's contention that Central Bank overruled the Second Circuit's recklessness standard under section 10(b). Moreover, even if we were to conclude that Coopers' argument had merit, we would still be bound to apply the recklessness standard in the face of the Court of Appeals' decision in Kline, supra. In that case, which was decided shortly after the Supreme Court rendered its opinion in Central Bank, the Court of Appeals reaffirmed that its interpretation of the Supreme Court's "scienter" requirement included reckless conduct. Kline at 486.
Coopers' suggestion that Kline is not dispositive of the issue because it was argued fifteen months before Central Bank was decided is belied by the fact that the Court of Appeals noted in Kline that, while Central Bank would appear to bar the plaintiffs' aiding and abetting claims against the defendant law firm, "we do not believe [Central Bank] affects our analysis with respect to whether [defendant] may be held liable for material misrepresentations or omissions as a primary violator [under section 10(b) ]...." Id. at 485, n. 4 (brackets supplied). The Court then applied the recklessness standard to plaintiffs' claims. Thus, Kline is binding precedent on this court and we hold that reckless conduct remains a substitute to the scienter requirement under section 10(b).
*686 Coopers next argues that, if recklessness remains the applicable standard, that standard requires proof that Coopers conducted a "sham" or "pretended" audit. Coopers reads the relevant authority too narrowly. As rehearsed, the Court of Appeals defined reckless conduct to include "shoddy accounting practices amounting at best to a pretended audit." McLean at 1198. However, in addition to proof of a sham audit, a plaintiff may prove reckless conduct by establishing that the grounds supporting an alleged misrepresentation were "so flimsy as to lead to the conclusion that there was no genuine belief back of it ... and that the danger of misleading ... was so obvious that the actor must have been aware of it." Id.
Viewing the facts in the light most favorable to plaintiffs, as we must, we hold that plaintiffs have adduced sufficient evidence from which a jury could conclude that Coopers' audits of Phar-Mor during the fiscal years 1989 through 1991 were "so flimsy as to lead to the conclusion that there was no genuine belief" to back Coopers' opinion in its 1989, 1990 and 1991 audit reports that the financial statements "present fairly, in all material respects, the financial position of Phar-Mor, Inc.... in conformity with generally accepted accounting principles."
We will not detail the evidence that plaintiffs contend establishes the existence of a jury question as to whether Coopers' alleged audit deficiencies arose to the level of reckless conduct. We find that plaintiffs' submission of the report of their expert, Professor George J. Benston, which concludes that Coopers was reckless in conducting its audits of Phar-Mor, is sufficient to avoid summary judgment. See, Paton v. La Prade, 524 F.2d 862, 871 (3d Cir.1975). It is significant that, in reaching his conclusion, Professor Benston placed particular emphasis on the fact that Coopers "ignored results of their own audit tests that indicated that the amounts recorded to end-of-year inventory could not be determined to an extent that would allow them to opine that Phar-Mor's financial statements ... were not materially misstated." Thus, in Professor Benston's opinion, Coopers had no grounds to support a genuine belief that the Phar-Mor's financial statements accurately reflected its financial condition. Our review of the voluminous documents of record confirms that sufficient evidence exists from which a jury could reasonably reach the same conclusion with respect to Coopers' audits of inventory.[9]
We next address Coopers' argument that plaintiffs' section 10(b) claims are partially untimely. Specifically, Coopers contends that the claims arising from plaintiffs' purchases of shares of Phar-Mor stock on November 22, 1989 are barred by the statute of limitations. In purchasing these shares, plaintiffs allegedly relied on the November 1, 1989 prospectus, which included Coopers' audit opinion for fiscal year 1989. Plaintiffs filed their original complaint on November 17, 1992.
A claim under section 10(b) and Rule 10b-5 "must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation." Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 364, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991) (emphasis added). The issue we must resolve is whether a "violation" occurs on the date that the alleged misrepresentation is made or whether it occurs at the time the securities are purchased.
Coopers states that there is a split of authority on the issue and submits that the better law is that a "violation" occurs at the time the misrepresentation is made. However, only one of the cases cited by Coopers, Randolph County Fed. Sav. & Loan Ass'n v. Sutliffe, 775 F.Supp. 1113 (S.D.Ohio 1991), actually addressed the issue presented *687 here.[10] In Randolph, the district court held that the triggering event was the sale or purchase of the securities. The court reasoned that a misrepresentation is not actionable under section 10(b) unless it is "in connection with the purchase or a sale of any security" and, therefore, the limitations period does not begin to run until the cause of action accrues, which is the date of the sale or purchase. Id. at 1121-22 (citing Hill v. Equitable Bank, 655 F.Supp. 631, 638 (D.Del. 1987), aff'd., 851 F.2d 691 (3d Cir.1988), cert. denied, 488 U.S. 1008, 109 S.Ct. 791, 102 L.Ed.2d 782 (1989) (cause of action under section 10(b) and Rule 10b-5 accrues as of the date of the sale or purchase of the securities)).
In view of the plain language of the opinion in Lampf, we disagree with the holding in Randolph and hold that the triggering event for the running of the limitations period on a section 10(b) claim is the making of the misrepresentation. In Lampf, the Court rejected the "state borrowing doctrine" and concluded that a uniform federal limitations period for section 10(b) and Rule 10b-5 claims should be adopted. In searching for an appropriate limitations period, the Court looked to the statute of origin, namely, the 1934 Act, as well as the Securities Act of 1933, for comparable express remedial provisions with explicit time limitations. The Court found a number of remedial provisions which apply some variation of the 1-and-3 year limitations period. Id. 501 U.S. at 360, 111 S.Ct. at 2780-81. Specifically noted were two express limitations periods contained within the 1934 Act at §§ 9(e) and 18(c).
The wording of sections 9(e) and 18(c) are identical with the exception that section 9(e) uses the term "violation" in defining the triggering event while section 18(c) defines it as a "cause of action."[11] The Supreme Court adopted the terminology of section 9(e). In doing so it noted:
that the various 1-and-3 year periods contained in the 1934 and 1933 Acts differ slightly in terminology. To the extent that these distinctions in the future might prove significant, we select as the governing standard for an action under § 10(b) the language of § 9(e) of the 1934 Act, 15 U.S.C. § 78i(e).
Id. at 364, n. 9, 111 S.Ct. at 2782.
The Court's recognition of the distinction between "violation" and "cause of action" and its adoption of the former leads us to conclude that the Court intended that the triggering event for the running of the limitations period is the making of the alleged misrepresentation, and not the accrual of the cause of action.
We also agree with Coopers that the Court's use of the term "violation," both for purposes of the one-year discovery limitation period and the 3-year period of repose supports the conclusion that a violation occurs at the time of the alleged fraudulent conduct, and not at the time of sale or purchase. It is undisputed that, under the 1-year limitations period, a party must commence a section 10(b) claim within one year after discovery of the facts constituting the fraudulent conduct. Were we to accept plaintiffs' argument that the 3-year period of repose does not begin to run until the sale or purchase of the securities, we would be applying two different meanings to the same word as it is used in the single sentence. This we will not do. Rather, we hold that a "violation" occurs as of the date of the alleged fraudulent misrepresentation or omission was made and therefore, because Coopers made the alleged misrepresentation on November 1, 1989, more than three years *688 before plaintiffs filed suit, we hold that the claims under section 10(b) and Rule 10b-5 related to plaintiffs' purchases of Phar-Mor stock on November 22, 1989 are time-barred. Summary judgement will be granted in favor of Coopers on those claims.
Coopers next challenges the merits of plaintiffs' claims under section 1-503 of the Pennsylvania Securities Act, 70 P.S. § 1-503. Section 1-503(a), which is entitled "Joint and several liability; contribution; corporation's right of indemnification," provides, in relevant part, that:
Every affiliate of a person liable under section 501 or 502, every partner, principal executive officer or director of such person, every person occupying a similar status or performing similar functions, every employe of such person who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the person liable hereunder proves that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.
70 P.S. § 1-503(a).[12] Giant Eagle contends that this section creates a cause of action for aiding and abetting in the violation of section 1-401. We disagree.
We have found only two cases which have ruled on the availability of aider and abettor liability under section 1-503. In Penturelli v. Spector Cohen Gadon & Rosen, 640 F.Supp. 868 (E.D.Pa.1986), the district court rejected the proposition that aider and abettor liability existed pursuant to section 1-503, and stated that:
It appears that the section only establishes a cause of action in favor of a party who has been held liable to a private party under section 501.
Support for the position that section 503 does not provide for a cause of action to a buyer against an aider and abettor is found in several cases. First, in [Biggans v. Bache Halsey Stuart Shields, Inc., 638 F.2d 605 (3d Cir.1980)], Judge Sloviter noted that the sole source of civil liability for any acts in violation of section 401 is found in section 501. 638 F.2d at 609. At the time Biggans was decided, section 503 was in effect and it would arguably have governed a case against a broker. In Sharp v. Coopers & Lybrand, 649 F.2d 175, 191-92 (3d Cir.1981), the court again held that the Pennsylvania Securities Act grants a private remedy to a buyer only against his seller. Similarly, in Zawid v. Elkins & Co., 33 D. & C.3d 185 (1982), the court held that the Pennsylvania Securities Act does not afford a private cause of action against a broker who is trading on accounts of others and thus is neither a buyer or seller subject to civil suit under the Act.
640 F.Supp. at 871.
In Schor v. Hope, 1992 WL 22189 (E.D.Pa., February 4, 1992), the district court refused to imply a cause of action against an accounting firm pursuant to section 1-503 on an aiding and abetting theory. As in Penturelli, the court concluded that section 1-503 "contemplate[s] an action by an individual who has been found liable under § 1-501 against other individuals involved in the sale of the securities." Id. at *4 (brackets supplied). See also, Gruber v. Price Waterhouse, 911 F.2d 960, 967 (3d Cir.1990) (section 1-503 concerns only "joint and several liability, contribution and a corporation's right to indemnification"). But cf., Arthur Young & Co. v. Reves, 937 F.2d 1310 (8th Cir.1991), aff'd., ___ U.S. ___, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) (Arkansas' version of section 1-503 provides for aider and abettor liability against accountants who originated false and misleading audit reports).
*689 We find the reasoning of Penturelli and Schor persuasive and hold that section 1-503 does not provide a private cause of action for aider and abettor liability. We will grant judgment for Coopers on plaintiffs' claims under the Pennsylvania Securities Act.[13]
Coopers next seeks judgment on the negligent misrepresentation claims of the PM Directors and GE Delaware on the basis that none of these plaintiffs were in privity of contract with defendant.[14] Coopers contends that, under Pennsylvania law, an action for negligence against an accountant cannot lie unless there is privity of contract between the parties. Plaintiffs rejoin that contractual privity is no longer the rule in Pennsylvania and has been replaced by the adoption of section 552 of the Restatement (Second) of Torts, which they contend provides a cause of action for negligent misrepresentation to "a limited group of persons for whose benefit" the alleged misrepresentations were intended. Moreover, Giant Eagle asserts that it is in direct contractual privity with defendant.
Seventy-six years ago, the Pennsylvania Supreme Court, in Landell v. Lybrand, 264 Pa. 406, 107 A. 783 (1919), first set forth the rule that, absent contractual relations between a plaintiff and the defendant accountants, an action founded in negligence does not lie. The court noted that a negligence claim must arise out of the breach of a duty and, because the plaintiff "was a stranger" to the accountants, there was no duty owed to the plaintiff upon which he could base a negligence claim. Id. 107 A. at 783.
Twelve years after Landell was decided, Judge Cardozo wrote the landmark majority opinion in Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931). In that case, the plaintiff, a creditor of the Stern Company, asserted claims of negligence and fraud against a firm of public accountants who had been engaged by Stern to perform an audit of its financial statements. The plaintiff averred that it had relied on the allegedly inaccurate financial statements and the certificate of the auditors that the statements represented a true and correct view of the company's financial condition. The Court of Appeals of New York held that the defendant accountants had no duty to the plaintiff upon which the latter could base its negligence claim. The court stated that permitting parties not in privity with the accountants to assert negligence claims would "expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes these consequences." Id. 174 N.E. at 444.
The privity doctrine established in Landell and Ultramares has been successfully attacked in a number of states, but it appears that a majority of states still recognize some form of the privity requirement in the context of accountant liability. See Swanson, Accountants' Liability: Theories of Liability, C994 ALI-ABA 1, 23-24 (1995) (citing cases). Moreover, the Pennsylvania Supreme Court reaffirmed the viability of the doctrine under Pennsylvania law in Guy v. Liederbach, 501 Pa. 47, 459 A.2d 744 (1983).[15] Although the court in that case crafted a narrow, third-party beneficiary exception to the privity rule and allowed the contractual claim of a plaintiff, who was both the named beneficiary and the named executrix of a will drafted by the defendant attorney, it held that privity is still required to maintain a professional malpractice action. In so holding, the court stated that "important policies require privity (an attorney-client relationship *690 or analogous professional relationship, or a specific undertaking) to maintain an action in negligence for professional malpractice." Id. 459 A.2d at 746. The court further opined that:
the policy concerns expressed in Ultramares Corp. v. Touche, supra, and the history in California, following its abolition of the privity requirement in negligence suits arising out of agreements to furnish professional services, persuade us we should not eliminate the privity requirement in malpractice actions based on negligence. Thus we retain the requirement that plaintiff must show an attorney-client relationship or a specific undertaking by the attorney furnishing professional services ... as a necessary prerequisite for maintaining such suits in trespass on the theory of negligence.
Id. 459 A.2d at 750. A number of federal courts, applying Pennsylvania law, have required that the plaintiff be in privity with the defendant to maintain a professional negligence action. See, e.g., Pell v. Weinstein, 759 F.Supp. 1107 (M.D.Pa.1991), aff'd; 961 F.2d 1568 (3d Cir.1992); Hartford Accident & Indemnity Co. v. Parente, Randolph, Orlando, Carey and Associates, 642 F.Supp. 38 (M.D.Pa.1985); Safeco Ins. Co. of America v. Stockton Bates & Co., 1985 WL 6250 (E.D.Pa. June 12, 1985); Wilder v. Williams, 1989 WL 67821 (W.D.Pa. February 7, 1989).
These authorities clearly establish that, under Pennsylvania law, a plaintiff cannot maintain an action for professional negligence in the absence of privity with the defendant.[16] Thus, for plaintiffs to survive Coopers' summary judgment motion on such a claim, it must show that it was in privity with Coopers.
Our holding that privity is a requisite element of a professional negligence claim does not, however, entirely resolve the privity question. As rehearsed, plaintiffs have also alleged claims under a negligent misrepresentation theory. Pennsylvania recognizes the tort of negligent misrepresentation and has adopted section 552 of the Restatement (Second) of Torts. Rempel v. Nationwide Life Ins. Co., 471 Pa. 404, 370 A.2d 366 (1977). The relevant provisions of that section provide as follows:
(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered ... (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it....
Restatement (Second) of Torts, § 552 (1977). Plaintiffs argue that Pennsylvania's adoption of this section eliminates the privity requirement as an element of a claim for negligent misrepresentation. For the reasons that follow, we disagree and hold that the absence of privity remains a bar to any and all claims against accountants founded in negligence.[17]
*691 Plaintiffs rely on the decision of the Court of Appeals in Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir.1985), cert. denied, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985), to support the contention that Pennsylvania does not require privity to maintain a negligent misrepresentation claim against professionals. In that case, the plaintiffs averred that three of the defendants, David Wasserstrom (an attorney), Frederich Gagnon and Bernard Boyers, orchestrated a scheme to sell securities in worthless coal rights as purported tax shelters. Plaintiffs invested in the securities in reliance on an offering memorandum distributed by the defendants. The offering memorandum was allegedly false and misleading in at least the following particulars: (1) it failed to disclose that Wasserstrom, Gagnon and Boyers had financial interests in the investments sold and that the vast bulk of the proceeds from the sale would be taken by these three individuals; (2) it included a written tax opinion by Wasserstrom which wrongly concluded that the IRS would allow the plaintiff's an immediate tax deduction for their investments; and (3) it included a statement by the defendant accounting firm that the assumptions underlying the projections for the investments were "not unreasonable" when in fact both Wasserstrom and the accountants purportedly knew that there was no reasonable basis for the assumptions. Id. at 773.
In addition to federal securities and RICO claims, the plaintiffs asserted state common law claims "for defendants' negligent misrepresentations in recommending and soliciting investments in enterprises in which they had an interest." Id. at 774. Following the trial, the jury found for the plaintiffs and against Wasserstrom on the state law negligence claim, and for the defendants, including the accounting firm, on all other claims (with one exception not relevant here). The district court then granted judgment n.o.v. to Wasserstrom on liability on the basis that plaintiffs had failed to prove reliance on the offering materials.
The Court of Appeals reversed the grant of judgment n.o.v. in favor of Wasserstrom on the negligence claim, concluding that the plaintiffs had adduced sufficient evidence for a jury to find reliance.[18] The Court then rejected Wasserstrom's argument that it could affirm the judgment n.o.v. on another ground, to-wit, that the jury's verdict "was, in reality, one for legal malpractice which was not proven because [Wasserstrom] had no attorney-client relationship with plaintiffs." Id. at 779. Although recognizing that legal malpractice liability in Pennsylvania generally extended only to a lawyer's clients, the Court concluded that:
plaintiffs' action in this case was not one for legal malpractice.
Plaintiffs' theory, presented in their amended complaint and in their opening and closing statements, was that Wasserstrom deceived them in a business transaction in which he had a pecuniary interest. Therefore, plaintiffs' verdict does not hinge on the breach of a duty an attorney owes clients or others in privity, but rests on the more general principles applicable to a seller or other interested party who misrepresents the nature and value of goods, the tort known generally as negligent misrepresentation.
Id. (emphasis supplied). The Court went on to state that the Restatement and the "weight of authority at common law" allow such claims to be brought by persons not in strict privity with the defendant.
Plaintiffs contend that the holding in Eisenberg eliminates the privity requirement under Pennsylvania law for claims asserted pursuant to section 552. Four district court *692 decisions have, without significant discussion on the issue, cited to Eisenberg as authority for that very proposition. See In re Chambers Development Securities Litigation, 848 F.Supp. 602, 626 (W.D.Pa.1994) (Lee, J.); In re Westinghouse Securities Litigation, 832 F.Supp. 948, 987 (W.D.Pa.1993) (Smith, J.); Hartford Accident & Indemnity Company v. Parente, Randolph, 1989 U.S. Dist. LEXIS 9411 *6 (M.D.Pa. July 31, 1989); Wilder v. Williams, 1989 WL 67821 (W.D.Pa. February 7, 1989) (Bloch, J.). In addition, we have found three district court decisions that have implicitly, without citation to Eisenberg, rejected a privity requirement for claims brought against accountants under section 552. Alten v. Atlantic Financial Federal, 805 F.Supp. 5, 7 (E.D.Pa.1992); Kline v. First Western Government Securities, 794 F.Supp. 542, 555 (E.D.Pa.1992), aff'd. in part and rev'd. in part on other grounds, 24 F.3d 480 (3d Cir.1994); Schor v. Hope, 1992 WL 22189 1992 U.S. Dist. LEXIS 1083 (E.D.Pa. February 4, 1992).
On the other hand, two recent decisions have rejected such a broad reading of Eisenberg and have limited its holding to the unique facts of that case. In First Options of Chicago, Inc. v. Wallenstein, 1994 WL 229554 (E.D.Pa. May 26, 1994), the plaintiff, a registered securities broker, brought an action against attorney Stephen Wallenstein, among others. Wallenstein represented MK Investments and Manuel Kaplan, its sole shareholder. The plaintiff alleged that Kaplan, with the knowledge and assistance of Wallenstein, engaged in a scheme to defraud plaintiff by misrepresenting the true financial status of MK Investments and Kaplan. After filing an original and an amended complaint, the plaintiff sought leave of court to file a second amended complaint to add a claim for negligent misrepresentation against Wallenstein. Wallenstein objected to the proposed amendment on the premise that it was futile in light of the fact that the plaintiff was not in privity with Wallenstein and therefore, could not maintain a negligent misrepresentation claim against him.
In concluding that privity was required to bring a negligence action against an attorney, the district court first cited to the Pennsylvania Supreme Court's decision in Guy, supra, and concluded that "[o]nly in special circumstances may a third-party bring a tort action against an attorney notwithstanding the absence of privity. Such special circumstances exist where the attorney's conduct is motivated by malice or involves the commission of an intentional tort." Id. at *3 (citing Pelagatti v. Cohen, 370 Pa.Super. 422, 536 A.2d 1337, 1347 (1987), appeal denied, 519 Pa. 667, 548 A.2d 256 (1988); Smith v. Griffiths, 327 Pa.Super. 418, 476 A.2d 22, 26 (1984)). Finding neither, the court upheld the privity requirement.
As here, the plaintiff in First Chicago argued that it could avoid the privity requirement by alleging a claim under section 552. The district court rejected this argument and explained that:
the express language of section 552 appears to create two scenarios under which individuals could be liable to third parties for negligent misrepresentation. First, an individual can be subjected to liability if he negligently supplies false information "in the course of his profession." Second, an individual can be subjected to liability if he negligently supplies false information "in any ... transaction in which he has a pecuniary interest."
However, the standards applicable to the two independent sources of duty under section 552 are not identical. It is clear that in the latter of these two scenarios, a third party can maintain a § 552 action against an attorney notwithstanding an absence of privity. [citing Eisenberg and In re Westinghouse Securities Litigation]. In reaching its holding, the Third Circuit distinguished negligent misrepresentation actions from legal malpractice or ordinary negligence claims, reasoning that where an attorney negligently misrepresents facts concerning a transaction in which he has a pecuniary interest,
the action does not hinge on the breach of duty an attorney owes clients or others in privity, but rests on the more general principles applicable to a seller *693 or other interested party who misrepresents the nature and value of goods....
Id. at *4 (quoting Eisenberg at 779).
The district court concluded that the plaintiff had failed to show any proof that Wallenstein had a pecuniary interest in the transaction between plaintiff and MK Investments and, hence, any misrepresentations that he made were done so "in the course of his profession." The court reasoned that such a claim arose out of the duty Wallenstein owed to MK Investments and, thus, was essentially the same as a claim for legal malpractice. Therefore, the court held that the plaintiff could not escape the privity requirement by invoking section 552 and leave to amend to assert such a claim was denied.
Similarly, in PNC Bank, Kentucky, Inc. v. Housing Mortgage Corp., C.A. No. 92-2215, ___ F.Supp. ___ [1994 WL 847813], Magistrate Report and Recommendations (W.D.Pa. March 8, 1994) (Benson, M.J.) (approved by Cohill, J. April 15, 1994), the district court adopted the report and recommendations of the magistrate judge that dismissed the claims of professional malpractice and negligent misrepresentation against Grant Thornton, an accounting firm, for lack of privity. The magistrate concluded that Eisenberg was factually distinguishable from the case before it because Grant Thornton did not have a pecuniary interest in the transaction in question. The magistrate reasoned that:
Pennsylvania's strict privity rule would be swallowed by an exception for negligent misrepresentation claims since an accountant always makes a representation, i.e., a report, which is often then reviewed by nonparties to the contract for various reasons.
* * * * * *
The court [in Eisenberg] noted that the theory presented by the plaintiffs was not that the attorney breached a duty which he owes one in privity with him, but instead that he misrepresented the nature and value of goods in a transaction.... Here, however, Grant is not a party alleged to have misrepresented the nature and value of goods. Rather, the intervenor-plaintiffs claim, although couched in terms of negligent misrepresentation, clearly involves the alleged breach by Grant Thornton of its obligation to perform audits of HMC financial statement [sic] according to Generally Accepted Auditing Standards. This is the very heart of a professional negligence claim.
Id., slip opinion at 14, 16, ___ F.Supp. at ___, ___ (brackets supplied).
Based on the case law discussed above, we hold that the Pennsylvania Supreme Court, in adopting section 552 of the Restatement, did not intend to eliminate the privity requirement for the maintenance of negligence claims against public accountants.
We find support for our holding first from the fact that the Supreme Court's apparent adoption of section 552 in Rempel v. Nationwide Life Ins. Co., 471 Pa. 404, 370 A.2d 366 (Pa.1977), occurred six years before that same court decided Guy v. Liederbach, supra. Thus, the Court recognized that the policy reasons emphasized in Guy for the retention of the privity requirement continued to be of vital importance. Were we to conclude, as urged by plaintiffs, that the privity requirement could be avoided merely by recharacterizing a professional negligence claim as one for negligent misrepresentation, the privity rule and the policies that it promotes would be effectively destroyed. In short, we find no intent on the part of the Supreme Court of Pennsylvania to eliminate the privity bar to negligence claims against accountants.
Additionally, we conclude that Eisenberg is not controlling here. Plaintiffs' contention that Eisenberg stands for the abolition of the privity rule in Pennsylvania is incompatible with the holding in Guy and, as rehearsed, would run counter to the important policy concerns recognized therein. Moreover, Eisenberg is distinguishable on its facts. There, the Court of Appeals concluded that the attorney's pecuniary interest in the sale of the securities gave rise to the his duty to the plaintiffs. The court emphasized that the duty did not arise out of the relationship the attorney had with his client, rather, it derived from the fact that the attorney was, at bottom, a seller of the securities. Under these circumstances, the attorney's duty rested "on the more general principles applicable *694 to a seller or other interested party who misrepresents the nature and value of goods...." Id. at 779.
In the instant case, there is no allegation that Coopers had a pecuniary interest in the transactions between plaintiffs and Phar-Mor and, thus, Coopers owed no duty to plaintiffs which would be akin to the duty owed by a seller or other interested party. Indeed, the allegation that is at the heart of plaintiffs' negligent misrepresentation claims, to-wit, that Coopers breached its duty to audit Phar-Mor's financial statements in accordance with generally accepted auditing standards, would also be the foundation for the assertion of professional negligence claims. Because the duty to perform the audit in accordance with those standards arose out of the contract between Coopers and Phar-Mor, it was, under Pennsylvania law, owed to Phar-Mor only.
We reject plaintiffs' reading of Eisenberg for another reason. We submit that if the Court of Appeals had intended to hold that Pennsylvania had effectively abolished its longstanding privity rule by adoption of section 552, it would not have done so without discussion or analysis of the relevant privity cases and the policies underlying the privity requirement.[19]
In sum, we conclude that the negligent misrepresentation claims of plaintiffs are merely cloaked professional malpractice claims and that, under Pennsylvania law, privity is a requisite element to such claims.
We must now determine whether the PM Directors and GE Delaware were in privity with Coopers. Clearly, the PM Directors were not. The audit engagement was between Coopers and Phar-Mor and any duties arising out of the engagement were owed to Phar-Mor, and not to the directors individually. Therefore, we will grant judgment in favor of Coopers on the PM Directors claims for negligent misrepresentation.
Whether GE Delaware was in privity with Coopers is a much closer question. GE Delaware was not a party to the Phar-Mor audit engagement and cannot look to that engagement as a source for a duty running from Coopers to GE Delaware. However, as we previously noted, Coopers was also Giant Eagle's outside auditor for over twenty years, including the period during which the fraud was perpetrated at Phar-Mor. Part of Coopers' responsibilities pursuant to its Giant Eagle engagement was to audit Giant Eagle's subsidiaries, including GE Delaware.
Neither party has addressed the issue of whether Giant Eagle's engagement of Coopers satisfies the privity requirement for GE Delaware. Moreover, the parties submissions do not sufficiently present the factual circumstances underlying the engagement between Coopers and Giant Eagle nor direct this court to the relevant portions of the record to permit us to make a determination as to whether GE Delaware was (1) in privity with Coopers, (2) a third-party beneficiary of the audit engagement, or (3) neither of the above. Therefore, Coopers' motion for summary judgment on GE Delaware's negligent misrepresentation claim will be denied.
Finally, Coopers has challenged certain damage claims of plaintiffs. Specifically, Coopers contends that plaintiffs cannot recover damages for the diminution in the value of its investments in Phar-Mor because such damages are derivative of the injuries suffered by Phar-Mor and therefore can only be asserted by Phar-Mor. In Burdon v. Erskine, 264 Pa.Super. 584, 401 A.2d 369 (1979), the Pennsylvania Superior Court stated that "[a]n injury to a corporation may, to be sure, result in injury to the corporation's stockholders. Such injury, however, is regarded as `indirect', and insufficient to give rise to a direct cause of action by the stockholder." Id. 401 A.2d at 370. Based on Burdine, we held in Trio v. Coopers & Lybrand, Civil Action No. 94-1002 (Opinion, August 31, 1994), that a stock optionee of Phar-Mor *695 could not recover damages against Coopers for losses he suffered in the form of the diminution in the value of his stock options. The same result controls here with respect to the claims of the PM Directors and judgment will be entered in favor of Coopers on those claims.
The claims of GE Delaware regarding the diminution in the value of its Phar-Mor interests must, again, be treated differently based on a possible direct contractual relationship with Coopers. An exception to the rule that stockholders cannot bring direct claims against third-parties for injuries suffered by the corporation exists when "there is a special duty, such as a contractual duty or fiduciary relationship between the wrongdoer and the shareholder." Chrysler Credit Corp. v. B.J.M., Jr. Inc., 834 F.Supp. 813, 838 (E.D.Pa.1993). See also, eds Adjusters, Inc. v. Computer Sciences Corp., 818 F.Supp. 120, 121 (E.D.Pa.1993). Because, as rehearsed, Coopers may have had a contractual duty to GE Delaware pursuant to the Giant Eagle audit engagement to ensure that Phar-Mor's financial statements accurately reflected its financial position, we will deny Coopers' motion for judgment on GE Delaware's claims for diminution in the value of its Phar-Mor holdings.
Finally, we will deny Coopers' motion for judgment on plaintiffs' claims for punitive damages. As rehearsed, sufficient evidence exists from which a jury could conclude that Coopers performed its audits of Phar-Mor recklessly. Hence, because punitive damages may be awarded for reckless conduct under Pennsylvania law, summary judgment is not appropriate. See. e.g., Feld v. Merriam, 506 Pa. 383, 485 A.2d 742 (1984).
In summary, we will grant summary judgment in favor of Coopers on the following claims:
(1) the section 10(b) and Rule 10b-5 claims of GE Delaware and the PM Directors premised on the purchases made by plaintiffs as part of the November 1989 stock offering;
(2) the claims of GE Delaware and the PM Directors for violations of section 1-503 of the Pennsylvania Securities Act and "various" other states' securities laws;
(3) the claims of the PM Directors for negligent misrepresentation; and
(4) the damage claims of the PM Directors based on the diminution in the value of their investments in Phar-Mor.
Coopers' motion will be denied in all other respects. A written order consistent with this opinion follows.

ORDER OF COURT
IT IS ORDERED that the motions (document nos. 1437 and 1567) of defendants, Coopers & Lybrand and the defendant class of Coopers' partners and principals (collectively referred to as "Coopers"), for summary judgment on the claims of plaintiffs, Giant Eagle of Delaware, Inc. ("GE Delaware"), Giant Eagle, Inc. ("Giant Eagle"), Gerald E. Chait, Stanley Moravitz, Irwin Porter, David S. Shapira, Farrell Rubenstein and Norman Weizenbaum (collectively referred to as "the PM Directors"), be and hereby are granted in part and denied in part.
IT IS ORDERED that the motions be and hereby are granted with respect to the claims of the PM Directors for violations of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 premised on the PM Directors' purchases of Phar-Mor stock during the November 1989 private placement offering. Judgment be and hereby is entered in favor of Coopers and against the PM Directors on these claims.
IT IS FURTHER ORDERED that the motions be and hereby are granted on the claims of the PM Directors and GE Delaware for violations of section 1-503 of the Pennsylvania Securities Act, 70 P.S. § 1-503, and various other states' securities laws. Judgment be and hereby is entered in favor of Coopers and against the PM Directors and GE Delaware on these claims.
IT IS FURTHER ORDERED that the motions be and hereby are granted on the claims of the PM Directors for negligent misrepresentation. Judgment be and hereby is entered in favor of Coopers and against the PM Directors on these claims.
*696 IT IS FURTHER ORDERED that the motions be and hereby are granted on the claims of the PM Directors seeking damages for diminution in the value of their investments in Phar-Mor. Judgement be and hereby is entered in favor of Coopers and against the PM Directors on these claims.
IT IS FURTHER ORDERED that the motions be and hereby are denied in all other respects.
NOTES
[1] The majority of the individual plaintiffs to this action have entered into a stipulation of settlement with Coopers and are no longer parties.
[2] In May, 1994, a jury convicted Monus of 109 felony counts consisting mainly of wire and mail fraud. Finn had previously plead guilty to criminal charges arising out of the fraud.
[3] In the opinion of Phar-Mor's expert, the Barrington Consulting Group, the fraud overstated the company's financial performance by approximately $500 million.
[4] We note that a defendant class of Coopers' partners and principals has been certified in each of the actions in the MDL. The defendant class has joined in Coopers' motion for summary judgment.
[5] Notwithstanding the fact that a number of plaintiffs in the other MDL actions have alleged that the fraud began at an earlier time, plaintiffs at bar assert that the fraud commenced in fiscal year 1989. Thus, Coopers' audits of Phar-Mor and Giant Eagle before fiscal year 1989 are not at issue here.
[6] The purchase amounts are taken from plaintiffs' third amended complaint.
[7] The only other state that would appear to have any significant contacts with the instant action would be Ohio as that is the state where Phar-Mor has its principal place of business and is also where Coopers did much of its fieldwork on the Phar-Mor audit. However, we hold that these contacts pale in comparison to Pennsylvania's contacts.
[8] The term "reckless" does not appear in the text of the statute. Section 10(b) provides only that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations [prescribed by the SEC]."
[9] Coopers' motion also seeks judgment on plaintiffs' claims for common law fraud on the basis that there is no evidence that it acted with scienter. Under Pennsylvania law, a claim for fraud can be established by showing that the defendant made a false misrepresentation "knowingly, or in conscious ignorance of the truth, or recklessly without caring whether it be true or false." Delahanty v. First Pa. Bank, N.A., 318 Pa.Super. 90, 464 A.2d 1243, 1252 (1983). Pursuant to our analysis with respect to Coopers' section 10(b) argument, we also deny summary judgment on the fraud claims.
[10] In none of the other cases was the issue determinative of whether the plaintiffs' claims were timely. Thus, whether the triggering event was the making of the misrepresentation or the purchase of the securities was irrelevant.
[11] Section 9(e) of the 1934 Act, 15 U.S.C. § 78i(e) provides:

No action shall be maintained to enforce any liability created under this section, unless brought within one year after the discovery of the facts constituting the violation and within three years after such violation.
Section 18(c) of the 1934 Act, 15 U.S.C. § 78r(c) provides:
No action shall be maintained to enforce any liability created under this section unless brought within one year after the discovery of the facts constituting the cause of action and within three years after such cause of action accrued.
[12] Section 1-501 of the Act provides the civil causes of action for violations of, inter alia, violations of section 1-401. Section 1-401 makes it "unlawful for any person, in connection with the offer, sale or purchase of any security in this State ... [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading." 70 P.S. § 1-401.
[13] We note that plaintiffs, in addition to alleging a claims under the Pennsylvania Securities Act, assert that Coopers is liable under "various state securities laws." Third Amended Complaint, ¶ 104. Even if we were to assume that plaintiffs could establish violations of the securities laws of states other than Pennsylvania, such unspecified claims are too vague to survive summary judgment and we will grant Coopers' motion with respect to them.
[14] Coopers does not raise the privity defense against Giant Eagle.
[15] The majority opinion in Guy was written by Justice Hutchinson, who now serves as a member of the Court of Appeals following his appointment to that position in 1987.
[16] A number of plaintiffs in the MDL actions cite to our opinion in Blaushild v. Grodin, Chotiner & Balmuth, C.A. No. 92-0995 (W.D.Pa. January 13, 1994) (Ziegler, C.J.), as support for the abolition of the privity rule. To the contrary, although we rejected the defendant accountants' privity defense, we did so on the basis that the facts in Blaushild established that the accountants were, in all practical respects, in privity with the plaintiffs. The defendants' engagement in that case was specifically requested, not by the client, but by the plaintiffs, who had already agreed to purchase Pittsburgh Plumbing & Heating Supply Corporation. The defendants were aware of the specific and singular purpose of the engagement, which was to prepare financial information for the plaintiffs so that they could determine the exchange ratio of the stock used in the purchase transaction. In holding that the facts establish a privity relationship because defendants specifically undertook the engagement to supply information to the plaintiffs, see, Guy, 459 A.2d at 750, we emphasized that "we have made no dramatic retreat from the privity rule under Pennsylvania law."
[17] We reject Coopers' contention that privity also bars claims founded in fraudulent or reckless conduct. Coopers has not cited to any authority for the extension of Pennsylvania's privity doctrine to claims of fraud or recklessness and we have found none. Moreover, in the seminal privity case of Ultramares, Judge Cardozo rejected the application of the privity defense to claims that the accountants "acted without information leading to a sincere or genuine belief when they certified an opinion that the balance sheet faithfully reflected the condition of the business." 174 N.E. at 449. See also, Michael v. Shiley, Inc., 46 F.3d 1316, 1334 (3d Cir.1995) (Pennsylvania law recognizes a cause of action for fraud by persons or class of persons with whom the fraudulent actor intends or has reason to expect will act or refrain from acting in reliance upon the misrepresentation).
[18] We note that the verdict in favor of the accounting firm on the state law negligence claim was not appealed.
[19] We recognize that our holding would appear to be in conflict with section 552(2) which states that liability under section 552(1) extends to "the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it." However, we find the provisions of section 552(2) to be in direct conflict with the holding in Guy and, therefore, not an accurate statement of Pennsylvania law.